1
2
3
4

David A. Ericksen (Bar No. 153923)
MURTAUGH TREGLIA STERN &
DEILY LLP
2603 Main Street, Penthouse
Irvine, California  92614-6232
(949) 794-4000/FAX (949) 794-4099
dericksen@murtaughlaw.com

5
6

Attorneys for Defendant/Cross-
Defendant MCINTOSH &
ASSOCIATES ENGINEERING, INC.

7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11

Adavco, Inc.,

12

Plaintiff,

13

v.

14

Deertrail Development LLC, et al.,

15

Defendants.

CASE NO.  1:23-cv-00695-JLT-SKO

**Assigned to:**
Hon. Jennifer L. Thurston (presiding)
Hon. Sheila K. Oberto (referral)

DECLARATION OF DAVID A.
ERICKSEN IN SUPPORT OF
MCINTOSH & ASSOCIATES
ENGINEERING, INC.'S OPPOSITION
TO MOTION FOR ENTRY OF
DEFAULT AND MOTION TO
VACATE OR SET ASIDE DEFAULT
JUDGEMENT

Hearing Date: January 10, 2023
Hearing Time: 9:30 a.m.
Dept.: Courtroom 4
Judge: Hon Sheila K. Oberto

16

17

18

19

20

21

22

23

## <u>DECLARATION OF DAVID A. ERICKSEN</u>

24

1.      I am an attorney duly admitted to practice before the Eastern

25

District Court of California and I am a Senior Partner at the law firm Murtaugh

26

Treglia Stern & Deily,  the attorneys of record for McIntosh & Associates

27

Engineering, Inc.

28

2.      I have spoken with counsel, reviewed relevant records, and spoken

MURTAUGH TREGLIA
STERN & DEILY LLP

3047322

- 1 -

DECLARATION OF DAVID A. ERICKSEN IN SUPPORT OF MCINTOSH & ASSOCIATES ENGINEERING,
INC.'S MOTION TO SET ASIDE DEFAULT JUDGEMENT

1    with parties, I have personal knowledge of the facts set forth herein and if called

2    as a witness, I could and would testify thereto or provide witnesses or documents

3    consistent with the following.

4         3.     McIntosh was a professional civil engineering business based in

5    Bakersfield, California.  The principal of McIntosh was Roger McIntosh.

6         4.     Mr. McIntosh passed away on June 10, 2021 following an extended

7    illness.

8         5.     Mr. McIntosh was survived by his spouse Beverly McIntosh who

9    sold the assets of the business to Mr. McIntosh's former colleagues on or about

10   February 1, 2022.  The new business was and is co-defendant New Gen

11   Engineering.

12        6.     The property known as Tract 6859 and Tract 6860 in Bakersfield,

13   California ("the Property") was owned by the Robert D. Nelson and Darin C.

14   Nelson Revocable Trust Dated July 28, 1997 ("the Nelson Trust").

15        7.     In or about that time, Plaintiff Adavco entered into an agreement

16   with the Nelson Trust for potential purchase and sale and subsequent

17   development of the Property ("Adavco-Nelson Agreement").  The Adavco-

18   Nelson Agreement has been described to me by counsel, but will not be provided

19   outside of formal discovery.

20        8.  I am informed by counsel that as part of the Adavco-Nelson

21   Agreement, Adavco assigned to the Nelson Trust all rights in any plans or

22   documents produced pursuant to the Adavco-Nelson Agreement.

23        9.     As part of its actions under the Adavco-Nelson Agreement, on or

24   about May 25, 2005, Adavco purportedly retained the engineering firm

25   SmithTech USA Incorporated ("SmithTech") to "supply engineering services . . .

26   for a General Plan Amendment, Zone Change, and Tentative Tract Map" for the

27   Property.  Copies of those agreements as I have received them are attached as

28   Exhibit A.

MURTAUGH TREGLIA
STERN & DEILY LLP

3047322

- 2 -

10.     SmithTech prepared and recorded a "Vesting Tentative Map" for each tract on the Property on or about August 19, 2008.  Copies of those Vesting Tentative Maps are attached hereto as Exhibit B.

11.  I am informed by review of documents and public records as well as discussions with counsel that Adavco and the Nelson Trust ultimately did not proceed with their purchase and sale or the contemplated development.

12.  I am informed based on correspondence reviewed that SmithTech continued to file extensions of time as to the "Vesting Tentative Map" for each tract on the Property up through at least January 17, 2019 which preserved the validity and vested status of the "Vesting Tentative Map" for each tract on the Property through at least December 27, 2021.  Copies of such extensions will be secured for presentation at any hearing.

13.     On or about April 12, 2021, the Nelson Trust entered into a Purchase and Sale Agreement with another purchaser – Deertrail Development LLC ("Nelson-Deertrail Agreement").  A copy of the Nelson-Deertrail Agreement is attached hereto as Exhibit C.

14.  The Nelson-Deertrail Agreement included an Assignment which expressly provided:

*B. Seller desires to induce Assignee to consummate the purchase of the Property by assigning to Assignee, on the terms and conditions set forth herein, its interest, ifanv. and only to the fullest ex/en/ assignable. in all entitlements, tentative and final maps, development rights, and privileges appurtenant to said Property, used, owned, or held solely in connection with the development of the Property including, without limitation: (i) any tentative map and/or final map and all entitlements, subdivision agreements, and other agreements relating solely to the development of the Property; (ii) all plans, specifications, maps, drawings, and other renderings relating solely to the development of the Property; (iii) all warranties and development rights solely benefiting the*

*Property; (iv) all rights, claims, or awards solely benefiting the Property; and (vi) all rights to receive a reimbursement, credit, or refund from the applicable agency or entity of any deposits or fees paid in connection with the development of the Property except as provided otherwise in the Agreement (collectively, the "Intangible Property").*

15.     Adavco filed its Complaint in this action on or about June 23, 2023.

16.     Based on my review of correspondence and conversations with counsel and others, when this matter was first filed, McIntosh engaged and communicated through attorney Greg Ryan of Ryan & Associates and attorney David Potter of Almeida Costa & Pinheiroto to respond to and engage with counsel for Plaintiff.  They did so and had discussions regarding the relevant facts and pleadings.  They also had discussions with counsel for McIntosh's successor, co-defendant New Gen Engineering.  As part of those discussions and thereafter, questions were raised as to whether service of the Complaint had been proper.  There were also discussions as to whether any entry of McIntosh into the litigation should have been deferred until after lead defendant Deertrail Development LLC's Motion to Dismiss as filed on or about June 14, 2023 was resolved.

17.     In the midst of those discussions, Plaintiff secured a Clerk's Certificate of Entry of Default against McIntosh on or about August 3, 2023.

18.     Based on my review of correspondence and conversations with counsel and others, further counsel was retained for McIntosh by its insurance carrier in mid-August 2023.  That counsel was Ted Levin of Clark Hill.  From mid-August 2023 to mid-September 2023, Mr. Levin along with McIntosh's other counsel continued discussions as to the adequacy of service and steps to vacate or set aside the Default as to McIntosh.

19.     That process remained incomplete as of September 18, 2023 when McIntosh's insurance carrier elected to change counsel from Mr. Levin to David

DECLARATION OF DAVID A. ERICKSEN IN SUPPORT OF MCINTOSH & ASSOCIATES ENGINEERING, INC.'S MOTION TO SET ASIDE DEFAULT JUDGEMENT

1   Ericksen, then of Hinshaw Culbertson.  At that time, Mr. Ericksen had been at
2   Hinshaw Culbertson for approximately two weeks as a new attorney.  As it
3   turned out, Hinshaw Culbertson was not a fit and on or about October 16, 2023,
4   Mr. Ericksen transitioned his practice to Murtaugh, Treglia, Stern, & Deily
5   where he is now.  Correspondence and documents received while at the Hinshaw
6   Culbertson firm have still not been provided to Mr. Ericksen.  Following
7   conversations with Plaintiff's counsel Brian Tamsut wherein Mr. Tasmut asked
8   for a showing that Mr. Ericksen was actually engaged in the matter, Mr. Ericksen
9   filed a Notice of Appearance in this action.

10          20.    Efforts before and since Mr. Ericksen's Notice of Appearance to
11   vacate or set aside the default have not been successful up to and including the
12   afternoon of December 15, 2023.

13          I make this Declaration under penalty of perjury.  Executed in Napa,
14   California on December 15, 2023.

15

16

17

18   _____

19          David A. Ericksen

20

21

22

23

24

25

26

27

28

MURTAUGH TREGLIA
STERN & DEILY LLP

3047322

DECLARATION OF DAVID A. ERICKSEN IN SUPPORT OF MCINTOSH & ASSOCIATES ENGINEERING,
INC.'S MOTION TO SET ASIDE DEFAULT JUDGEMENT

# EXHIBIT A



# SmithTech ★ USA
## INCORPORATED

May 25, 2005

ADAVCO, INC.                              Subj.: Proposal for
Annette Davis                     Engineering & Survey Services
P.O. Box 2346                            A.P.N. 497-040-08
Bakersfield, CA 93303             Location: No. of Taft Hwy. and
                                  W. of Gosford– Old River Sod Piece

Dear Annette:

   SmithTech/USA, Inc. proposes to supply engineering services on the above A.P.N. for a General Plan Amendment, Zone Change, Annexation and Tentative Tract Map. All of the above will be completed for an amount of $55,000.00.

   The above proposal does not include outside consultants, blueprint costs or governmental fees. We will bill you monthly for contract services.

   The financial arrangements are on the basis of prompt payment of our bills and the orderly and continuous progress of the project.

   This proposal represents the entire understanding between ADAVCO, INC., Annette Davis and SmithTech/USA, Inc. in respect to the abovementioned project, and may be modified only in writing and signed by both parties. If this letter satisfactorily sets forth your understanding of this agreement, please sign in the space provided below and return a copy to SmithTech/USA, Inc.

   We appreciate the opportunity to provide this proposal. If you have any questions regarding this proposal, please do not hesitate to call.

Respectfully submitted,

SmithTech/USA, Inc.

Robert E. Smith
President

Approved this 26th day of
       May            , 2005.

By: _____

Enclosures
APN-08proposal

THE HABERFELDE BUILDING
1424 17th Street * Bakersfield, CA * 93301 * 661-327-8492 * Fax 661-327-8493



# SmithTech ★ USA
## INCORPORATED

May 25, 2005

ADAVCO, INC.
Annette Davis
P.O. Box 2346
Bakersfield, CA  93303

Subj.: Proposal for
Engineering & Survey Services
**A.P.N. 497-040-09**
Location: NW corner of Taft Hwy.
and Gosford Rd. - Old River Sod Piece

Dear Annette:

**SmithTech/USA, Inc.** proposes to supply engineering services on the above A.P.N. for a General Plan Amendment, Zone Change, Annexation and Tentative Tract Map. All of the above will be completed for an amount of **$55,000.00**.

The above proposal does not include outside consultants, blueprint costs or governmental fees. We will bill you monthly for contract services.

The financial arrangements are on the basis of prompt payment of our bills and the orderly and continuous progress of the project.

This proposal represents the entire understanding between ADAVCO, INC., Annette Davis and **SmithTech/USA, Inc.** in respect to the abovementioned project, and may be modified only in writing and signed by both parties. If this letter satisfactorily sets forth your understanding of this agreement, please sign in the space provided below and return a copy to **SmithTech/USA, Inc.**

We appreciate the opportunity to provide this proposal. If you have any questions regarding this proposal, please do not hesitate to call.

Respectfully submitted,

SmithTech/USA, Inc.

Robert E. Smith
President

Approved this _26th_ day of
_____ May _____, 2005.

By: _____

Enclosures
APN-09proposal

**THE HABERFELDE BUILDING**
1424 17th Street * Bakersfield,  CA * 93301 * 661-327-8492 * Fax 661-327-8493

EXHIBIT B



## VICINITY MAP

N.T.S.

## GENERAL NOTES

1. 6,000 S.F. MIN. LOT SIZE
2. ⟶ TENTATIVE DIRECTION OF STREET FLOW
3. INTERSECTION, KNUCKLES & CUL-DE-SAC RADIUS PER CITY DESIGN STANDARDS
4. WATER: CITY OF BAKERSFIELD
5. SEWER: CITY OF BAKERSFIELD
6. ELECTRIC: P G & E
7. GAS: P. G & E.
8. PHONE: SBC
9. CABLE T.V.: BRIGHT HOUSE COMMUNICATIONS
10. LAKESIDE SCHOOL DISTRICT
11. KERN HIGH SCHOOL DIST.: RIDGEVIEW HIGH SCHOOL
12. BLUE BORDER INDICATES LAND TO BE SUBDIVIDED
13. CONTOUR INTERVAL = ONE FOOT
14. GENERAL PLAN LAND USE DESIGNATION: LR
15. A.P.N.: 497-040-08
16. EXISTING ZONING: R-1
17. TOTAL ACREAGE: 81.03 GROSS AC. / 60.77 NET AC.
18. TOTAL LOTS: 347 (340 BUILDABLE, 6 LANDSCAPE LOTS, 1 SUMP)
19. RESIDENTIAL DENSITY: 5.60 D.U./NET. AC.
20. DRILL SITE TO BE PLACED OFF-SITE
21. THE PROJECT AREA IS UNDER ANNEXATION TO THE CITY OF BAKERSFIELD AS GOSFORD # 1 ANNEXATION # 527
22. MAP TO BE PHASED, MULTIPLE FINAL MAPS WILL BE FILED
23. L/S LOTS B, C, D, AND E TO BE MULTI-PURPOSE TRAILS INCLUDED IN THE OLD RIVER RANCH MASTER PARKS AND TRAILS PLAN
24. ALL EXISTING STRUCTURES TO BE REMOVED OR RELOCATED PRIOR TO RECORDATION OF FINAL MAP

H = HOUSE
B = BUILDING

## EASEMENT NOTES

EASEMENTS AFFECTING THIS MAP:

⟨1⟩ EASEMENT TO PACIFIC GAS AND ELECTRIC COMPANY FOR POLE LINE PURPOSES PER BOOK 1467 PAGE 94 OF O.R.

EASEMENTS NOT AFFECTING THIS MAP:

EASEMENT TO PACIFIC GAS AND ELECTRIC COMPANY FOR POLE LINE PURPOSES PER BOOK 1467 PAGE 95 OF O.R.

EASEMENTS WHICH ARE UNLOCATEABLE FROM RECORD:

AN EASEMENT TO KERN COUNTY LAND COMPANY PER BOOK 80, PAGE 37, DEEDS (NOT DISCLOASED OF RECORD)

## ALTERNATE STREET NAMES

| | | |
|---|---|---|
| LOREENA | SIOUXIE | LACEY |
| CRISTINA | KARIN | EDERA |
| KYOKO | KEMI | ANASSANE |
| TINA ROOT | LIINA | MIRANDA GARDEN |
| ATARAXIA | AURORA | CHANDEEN |

## ADDITIONAL NOTES

OWNER: THE ROBERT D. NELSON AND DARIN C. NELSON 1997 REVOCABLE TRUST
P.O. BOX 2346
BAKERSFIELD, CA 93303

SUBDIVIDER: ADAVCO, INC.
PO BOX 2346
BAKERSFIELD, CA 93303

ENGINEER: SMITHTECH/USA, INC.
1424 17TH STREET
BAKERSFIELD, CA 93301

## LEGAL DESCRIPTION

BEING THE N 1/2 OF THE SE 1/4 OF SECTION 32, T. 30 S., R. 27 E., M.D.M., OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING WEST OF GOSFORD ROAD, AND GENERALLY NORTH OF TAFT HIGHWAY.

CROSS SECTION
OLD RIVER RANCH
PARKS & TRAILS PLAN

SCALE: 1" = 100'

APPROVED BY PLANNING COMMISSION WITH CONDITIONS ON AUG 17 2006

LICENSED LAND SURVEYOR ROBERT E. SMITH 5565 Exp. 9-30-07 STATE OF CALIFORNIA

"VESTING"

# TRACT NO. 6859
## TENTATIVE MAP

SmithTech USA
INCORPORATED
HABERFELDE BUILDING
1424 17TH STREET
BAKERSFIELD, CALIFORNIA 93301
(661) 327-8492 FAX 327-8493

[signature] 7-31-06

| ROBERT E. SMITH | RCE 35473 | DATE |
|---|---|---|
| JOB NO. – 04-144 | SHEET 1 OF 1 SHEETS | |



"VESTING"
TRACT NO. 6860 — TENTATIVE MAP & SUBSTANTIAL CONFORMANCE

EXHIBIT C

## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

      **THIS** *PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS* ("**Agreement**") is entered into as of APRIL  12  , 2021, (the "date hereof" or the "**Effective Date**"), by and between **DARIN C. NELSON**, Trustee of **THE ROBERT D. NELSON AND DARIN C. NELSON REVOCABLE TRUST DATED JULY 28, 1997** ("**Seller**"), and **DEERTRAIL DEVELOPMENT LLC**, a California limited liability company or Assignee ("**Buyer**"), with reference to the following facts:

      A.     Seller owns certain real property located in Bakersfield (the "**City**"), Kern County (the "**County**"), State of California, commonly known as Kern County Assessor's Parcel Nos. 543-010-08 and 543-010-10, 543-010-12 consisting of One Hundred Forty-Six and Sixty-One Hundredths assessed acres (146.61 assessed acres) including, among other things, 606 tentative mapped lots comprising the entirety of Tentative Tract Map No. 6859 and Tentative Tract Map No. 6860, which real property is more particularly described in **Exhibit A** attached hereto (collectively, the "**Property**"). The term "**Property**" shall also include all of Seller's rights, title, and interest in and to all entitlements, tentative and final maps, easements, mineral rights, oil and gas rights, water, water rights, air rights, development rights, and privileges appurtenant to said Property, and all improvements located thereon if any, and only to the extent assignable.

      B.     Seller and Buyer desire to terminate and supersede in their entirety all prior offers, letters of intent, side letters and other arrangements between the parties or their predecessors, representatives, or agents.

      **NOW, THEREFORE, IN RELIANCE** upon the foregoing Recitals and in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE I

### PURCHASE AND SALE OF PROPERTY

      **1.1**   **AGREEMENT OF SALE**. Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the Property by a grant deed substantially in the form of **Exhibit B** attached hereto (the "**Grant Deed**") and by an assignment of intangibles and bill of sale in the form of **Exhibit C** attached hereto (the "**Assignment of Intangibles**"), all subject to and in strict accordance with the terms and conditions set forth herein.

**ARTICLE II**

**PURCHASE PRICE**

     **2.1**    **PURCHASE PRICE**.  The purchase price for the Property (the "**Purchase Price**") shall be the sum of Six Million Six Hundred Fifteen Thousand Dollars and No Cents ($6,615,000.00).

     **2.2**    **PAYMENT OF PURCHASE PRICE**. The Purchase Price shall be paid as follows:

     (a)    Within five (5) business days from and after the full execution of this Agreement by Buyer and Seller, Buyer shall remit to FIRST AMERICAN TITLE INSURANCE COMPANY, a Nebraska corporation authorized to do business in the State of California ("**Escrow Holder**"), located at the address stated in Section 9.1 below, the sum of One Hundred Thousand Dollars and No Cents ($100,000.00) by cashier's check or wire transfer in immediately available funds as a deposit toward the Purchase Price (the "**Initial Deposit**"). In the event that Buyer elects to proceed with the transaction during the Due Diligence Period, then Buyer shall on or before the expiration of the Due Diligence Period, remit the additional sum of One Hundred Thousand Dollars and No Cents ($100,000.00) (the "**Second Deposit**") to Escrow by cashier's check or wire transfer in immediately available funds (which together with the Initial Deposit, is collectively referred to as the "**Deposit**"), which shall be non-refundable except as expressly set forth herein, but applicable to the Purchase Price.

     (b)    The remaining balance of the Purchase Price shall be paid in cash, which Buyer shall deliver to Escrow Holder by wire transfer in immediately available funds at least one (1) business days prior to the Closing Date, plus all of Buyer's costs of escrow hereunder, as adjusted to reflect Buyer's share of closing prorations hereunder and the Deposit.

     (c)    Seller and Buyer agree that a portion of the Deposit in the sum of One Hundred Dollars ($100) (the "**Independent Consideration**") represents the amount bargained for and agreed to as consideration for Buyer's exclusive right to purchase the Property and the Due Diligence Period provided for hereunder and for Seller's execution and delivery of this Agreement. Notwithstanding anything to the contrary contained herein, the Independent Consideration is in addition to and independent of all other consideration provided in this Agreement, and is nonrefundable in all events; provided, however, if the Closing occurs the Buyer shall receive a credit to the Purchase Price for the Independent Consideration.

     (d)    If Buyer fails to deliver the Initial Deposit or Second Deposit as required herein, and such failure continues for a period of three (3) days after written notice from Seller, then either Party may terminate this Agreement by written notice to the other at any time prior to Buyer's delivery of the Initial Deposit or Second Deposit.  If this Agreement is so terminated, (i) this Agreement shall be deemed to have terminated as of the date that the Initial Deposit or Second Deposit, as applicable, was originally to have been deposited by Buyer; (ii) the Initial Deposit shall be returned to Buyer, to the extent previously delivered; and (iii) there shall be no remedy hereunder to either Party other than the termination of this Agreement.

**2.3    DEPOSIT AS LIQUIDATED DAMAGES.** IF THE SALE OF THE PROPERTY CONTEMPLATED HEREUNDER IS NOT CONSUMMATED ON OR PRIOR TO THE CLOSING DATE AS A RESULT OF A DEFAULT UNDER THE TERMS OF THIS AGREEMENT ON THE PART OF BUYER, AND SELLER IS NOT IN DEFAULT HEREUNDER, ESCROW HOLDER SHALL DELIVER THE DEPOSIT (INCLUDING ALL ADDITIONS THERETO AND INTEREST EARNED FROM THE INVESTMENT THEREOF) TO SELLER (OR IF PREVIOUSLY RELEASED TO SELLER, SELLER SHALL BE ENTITLED TO RETAIN THE DEPOSIT) AS LIQUIDATED DAMAGES PROMPTLY UPON RECEIPT OF NOTICE FROM SELLER TO THAT EFFECT GIVEN AFTER THE EXPIRATION OF ANY APPLICABLE NOTICE AND CURE PERIOD. THE PARTIES ACKNOWLEDGE AND AGREE THAT SELLER'S ACTUAL DAMAGES IN SUCH AN EVENT, INCLUDING, WITHOUT LIMITATION, SELLER'S ACTUAL COSTS INCURRED IN NEGOTIATING AND DRAFTING THIS AGREEMENT, SATISFYING CONDITIONS TO CLOSING AND SEEKING ANOTHER BUYER, AND SELLER'S OPPORTUNITY COSTS IN KEEPING THE PROPERTY OUT OF THE MARKETPLACE AND BEING UNABLE TO USE THE PROCEEDS FROM THE SALE OF THE PROPERTY FOR OTHER PURPOSES, WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN PROSPECTIVELY AND, THEREFORE, BY PLACING THEIR INITIALS BELOW, BUYER AND SELLER ACKNOWLEDGE THAT SUCH AMOUNT, FROM TIME TO TIME EXISTING, HAS BEEN AGREED UPON, AFTER NEGOTIATION, TO BE THEIR REASONABLE ESTIMATE OF SELLER'S DAMAGES AND TO BE SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST BUYER AS A RESULT OF SUCH FAILURE TO CLOSE. NOTWITHSTANDING THE FOREGOING NOTHING IN THIS SECTION 2.3 LIMITS SELLER'S REMEDIES FOR ANY CLAIM FOR INDEMNITY THAT SURVIVES THE TERMINATION OF THIS AGREEMENT (WHETHER THE CLOSING HAS OCCURRED OT NOT), AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OR ANY CLAIMS FOR ATTORNEYS' FEES UNDER SECTION 9.7. NOTWITHSTANDING THE FOREGOING NOTHING IN THIS SECTION 2.3 LIMITS SELLER'S REMEDIES FOR ANY SELLER'S POST-CLOSING REMEDIES FOR ANY BREACH BY BUYER OF ANY REPRESENTATION, WARRANTY, OBLIGATION OR INDEMNITY THAT SURVIVES THE CLOSING, AS EXPRESSLY SET FORTH IN THIS AGREEMENT, OR CLAIMS FOR ATTORNEYS' FEES UNDER SECTION 9.7, SHALL INCLUDE ALL REMEDIES AVAILABLE AT LAW OR IN EQUITY.

**Buyer Initials:** _RB MOLI_          **Seller Initials:** _dn_

### ARTICLE III

### TITLE; INSPECTIONS; CONTINGENCIES; "AS IS" SALE

**3.1    TITLE TO THE LAND.**

(a)    Within five (5) business days after the Effective Date, Escrow Holder shall cause to be delivered to Buyer and Seller an electronic preliminary report with hyperlinks to all of the title exception documents and with a colored map(s) showing plottable easements issued by

FIRST AMERICAN TITLE INSURANCE COMPANY ("**Escrow Holder**") for the Property, setting forth the condition upon which Escrow Holder is willing to issue its Policy of Title Insurance (CLTA Standard Coverage) with respect to the Property and, from time to time after the date hereof, supplemental reports as the same become available in the course of Escrow Holder's standard business practices (all of such preliminary reports, as supplemented, being hereinafter referred to collectively as the "**PTR**"). As a condition to Closing, the Escrow Holder shall unconditionally commit to issue, as of the date of the applicable Closing Date, an American Land Title Association owner's policy of title insurance, with a liability limit of the sum equal to the Purchase Price, insuring the fee, and showing no exceptions not included within Approved Title, as defined below ("**Title Policy**").

(b)     Buyer shall have until the date which is forty-five (45) calendar days from and after the actual date of the delivery of the PTR, which delivery may occur electronically, to notify Seller and Escrow Holder in writing of those exceptions to title first shown thereon, if any, which are unacceptable to Buyer ("**Disapproved Exceptions**"). All matters shown on the PTR with respect to which Buyer fails to timely give such notice shall be conclusively deemed to have been approved by Buyer and shall thereafter constitute part of "**Approved Title**" hereunder.

(c)     If Buyer shall give timely notice under Section 3.1(b) of any Disapproved Exception, Seller may, but shall not be obligated to, within ten (10) calendar days ("**Cure Period**") after receipt of Buyer's Disapproved Exceptions, to notify Buyer and Escrow Holder either (i) that Seller will cure such Disapproved Exception and will provide Buyer with evidence reasonably satisfactory to Buyer that such Disapproved Exception has been cured on or before the Closing Date; or (ii) that Seller will not cure such Disapproved Exception. Seller's failure to give such notice with respect to a Disapproved Exception shall conclusively constitute an election under clause (ii) of this Section 3.1(c) to not cure such Disapproved Exception. Notwithstanding the foregoing, Seller shall be obligated to release on or before the Closing Date, at its sole cost and expense, all trust deeds and other monetary liens, whether voluntary or involuntary, which encumber the Property.

(d)     In the event Seller elects or is deemed to elect not to cure any Disapproved Exception under clause (ii) of Section 3.1(c), Buyer shall have the option at any time prior to the expiration of the Due Diligence Period in which to terminate this Agreement by written notice to Seller and Escrow Holder to that effect.

(e)     Possession of Property shall be delivered at Closing free and clear of all matters except the Permitted Exceptions. The term "**Permitted Exceptions**" shall include the following: (a) the lien for current real property taxes and any supplemental real property taxes, a lien but not yet due and payable; (b) The lien for supplemental taxes, if any, assessed, and not yet due and payable as of each Closing, but only to the extent arising out of events occurring on or after each Closing; (c) subject to Buyer's review and approval of the title commitment, all easements, licenses, rights-of-ways, similar agreements, and other matters of record as of the Effective Date; (d) all applicable building, land use and zoning Applicable Laws (defined below) in effect as of each Closing; (e) any exception(s) to title created by Buyer; (f) such printed exceptions and exclusions from coverage as are usually contained in the form of title commitment issued to Buyer; (g) any other exceptions to title approved by Buyer pursuant to this Section 3 or specifically waived in writing by Buyer; and, (g) all applicable building and zoning Applicable Laws now and in effect as of the Closing. The term "Applicable Laws" (singularly an "Applicable

Law" and collectively and in combination "Applicable Laws") shall mean any acts, administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Agency charged with the enforcement, interpretation or administration thereof, agreements with, approvals, authorizations, awards, codes, consents, covenants, declarations, decrees, determinations, directed duties, directives, guideline documents, guidelines, edicts, exemptions, injunctions, judgments, laws, licenses, non-contractual restriction, orders, ordinances, permits, process, regulations, statutes, codes, rules, orders, decrees, determinations, covenants, and requests, requirements, restrictions, rules, rulings, sanctions, standards, statutes, treatises, waivers and/or writs, now in force or as may be enacted or amended, changed, modified, promulgated, revised, or supplemented, relating to the Property and every part thereof.

### 3.2   DUE DILIGENCE PERIOD; MATERIAL TO BE FURNISHED BY SELLER PRIOR TO CLOSING.

(a)     No later than ten (10) business days from and after the Effective Date, Seller shall make available to Buyer, by way of a DropBox or other downloadable internet link for review, all studies, plans, entitlements, documents, instruments, permits, reports, correspondence and the like to the extent the same exist and are within Seller's possession, custody and/or reasonable control pertaining to the Property (collectively, the **"Due Diligence Items"**).

(b)     Seller shall also procure, at its sole cost and expense, and cause to be delivered to Buyer, a Natural Hazard Disclosure prepared by a professional provider of such reports, with respect to the Property. "Natural Hazard Disclosure," shall mean whether the Property is located within: (i) Special Flood Hazard Area; (ii) Dam Failure Inundation Area; (iii) Earthquake Fault Zone; (iv) Seismic Hazard Zone; (v) High Fire Severity Area; and/or (vi) Wildland Fire Area, all as shall be more specifically defined in the National Hazard Disclosure.

(c)     Notwithstanding the foregoing, the Due Diligence Items shall not include any proprietary, privileged or confidential information of Seller relating to the Property, including but not limited to, Seller's internal financial analyses, materials relating to Seller's cost to acquire the Property, any documents or communications subject to the attorney/client privilege or attorney work product protection, tax returns, internal memoranda, and appraisals.

(d)     Buyer acknowledges and agrees that by providing the link to the items in the DropBox or other downloadable internet link Seller shall have been deemed to comply with the obligation to make the Due Diligence Items available. Buyer acknowledges and agrees that the Due Diligence Items have been obtained by Seller from various sources and are furnished by Seller to Buyer without representation or warranty, express or implied, and without regard to the accuracy, completeness, truth or validity of the information contained therein. Notwithstanding the foregoing, Seller shall notify Buyer within five (5) business days if any additional Due Diligence Items are discovered and/or produced by or on behalf of Seller, and Seller shall deposit such additional Due Diligence Item into the DropBox or other downloadable internet link within the specified five (5) business day period. Buyer acknowledges and agrees that given the extensive nature of the Due Diligence Items, that Seller shall have been deemed to comply with the obligation to make the Due Diligence Items available so long as Seller makes a good faith effort to make all such additional Due Diligence Items available to Buyer within such time frame, and Seller shall not be in default hereunder, nor shall the Due Diligence Period be extended by the inadvertent failure to include each and every item described above within the specified five (5)

business day period, so long as Seller makes such items available to Buyer promptly upon the discovery of the failure to deliver such item.

(e)     Buyer acknowledges and agrees that Seller would not provide any Due Diligence Item but for Buyer's acknowledgment and agreement hereby that (a) except as expressly set forth herein no representation or warranty whatsoever on the part of Seller shall be deemed made or inferred by any such delivery, including, without limitation, (1) any warranty that any Due Diligence Item is complete, unmodified, in force or effect, (2) any warranty that any Due Diligence Item is accurate in any respect, (3) any warranty that all items similar or related to any Due Diligence Item in the possession of members of Seller or Seller's attorneys, appraisers, receivers or other agents are included with such delivery, or (4) any warranty that all items related to the Property or to any aspect thereof in the possession of Seller are included with such delivery, and (b) Buyer shall independently undertake all such investigation and review that it deems appropriate prior to the Due Diligence Period with respect to all tenant and other matters affecting the Property.

(f)     Buyer shall independently undertake all investigations and review that it deems appropriate with respect to all matters affecting the Property prior to 5:00 p.m. Pacific Time on the date that is the seventy-fifth (75th) calendar day from and after the Effective Date, such period is referred to herein as the **"Due Diligence Period"**.

(g)     Buyer shall have the option at any time on or prior to the expiration of the Due Diligence Period in its sole and absolute discretion to terminate or proceed with this Agreement by notice to Seller to that effect. Buyer's failure to either (i) provide Seller with a notice that it elects to proceed with the Agreement prior to the expiration of the Due Diligence Period or (ii) timely make the Second Deposit shall constitute Buyer's election to terminate this Agreement in which case, (i) this Agreement shall terminate, (ii) the Initial Deposit less the Independent Consideration shall be returned to Buyer, and (iii) neither Buyer nor Seller shall have any further obligation hereunder, except for those provisions which survive such termination. In the event Buyer elects to make the Second Deposit and proceed with the transaction, Buyer shall remit the Second Deposit to Escrow in accordance with Section 2.2(a) above. Buyer acknowledges and agrees that in the event it elects to proceed with this Agreement and makes the Second Deposit contemplated herein, then any failure by it to consummate the purchase of the Property prior to the Closing Date (unless Seller shall be in default hereunder or if such failure is specifically excused under the provisions of Section 7.1 of this Agreement) shall result in its forfeiture of the Deposit under Section 2.3 above.

**3.3   MATERIAL TO BE FURNISHED BY BUYER PRIOR TO CLOSING**. As soon as reasonably practicable after the date hereof, but in no event later than the date, if any, specified below, Buyer and Seller, as applicable shall deliver to the other and Escrow Holder each of the following items or, if not available, a statement either describing the same in reasonable detail or to the effect that the same does not exist:

(a)     Within five (5) business days after request therefor, such authorizations or other organizational documents or certificates relating to Buyer's status and authority to undertake this transaction as the Escrow Holder may reasonably request to evidence that Buyer is duly and validly organized and existing in good standing, has duly and validly executed this Agreement and has full authority to execute all documents required to consummate the transactions contemplated

herein and that all of the same are or shall when executed be binding on and enforceable against Buyer in accordance with their terms.

(b) Within five (5) business days after request therefor, such authorizations or other documents or certificates relating to the status and authority of Seller as the Escrow Holder may reasonably request to evidence that Seller has duly and validly executed this Agreement and has full authority to execute all documents required to consummate the transactions contemplated herein, including without limitation, the Grant Deed(s), and that all of the same are or shall when executed be binding on and enforceable against Seller in accordance with their terms.

(c) Within ten (10) business days after request therefor, such other items as Escrow Holder,  or Seller may reasonably request in connection with the transactions contemplated hereunder.

### 3.4 INSPECTIONS.

(a) Provided that Buyer shall have otherwise complied with all of the provisions of this Agreement and, further, satisfied the following additional conditions, Buyer and its representatives, at its sole cost and expense without right of reimbursement from Seller, may enter upon and inspect the physical condition of the Property at all reasonable times from and after Escrow Holder's receipt of the Deposit required under Section 2.2(a) above until the Closing Date or, if earlier, the date this Agreement is terminated for any reason.

(b) In connection with any entry, inspection or test with respect to the Property by Buyer or any of its contractors, employees, representatives or agents at any time (and whether or not pursuant to this Agreement or otherwise authorized or permitted by Seller), Buyer agrees to satisfy the following additional conditions and requirements:

(i) Buyer shall have delivered Seller at least 48 hours prior notice of such inspection and the identity of the firm who will undertake the same.

(ii) Seller shall have received an insurance certificate reasonably satisfactory to Seller, naming Seller as an additional insured thereunder, from any third-party inspector engaged by Buyer, for public liability, personal injury or death, property damage and other insurance covering all risks arising out of such entry with liability in the amount of no less than Two Million Dollars and No Cents ($2,000,000.00).

(iii) Such entry and inspection shall not, without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, damage the Property in any respect (i.e., destructive testing).

(iv) Buyer shall promptly restore the Property to its condition prior to such inspection and obtain all receipts, releases, waivers, discharges and assurances and perform all other acts necessary to keep the Property free from materialmen's, mechanics', design professionals', attorneys' and other liens and all other claims arising out of such inspection. If a lien is recorded on the Property due to Buyer's exercise of its rights this section 3.4 (an "**Access Lien**"), Buyer may dispute such Access Lien, provided that within twenty (20) days after Seller provides Buyer notice that such Access Lien was recorded, Buyer will, at its sole cost and expense without right of reimbursement from Seller, cause an appropriate bond to be recorded from an appropriate third party surety in an amount sufficient to promptly insure over any such Access

Lien on the Property. Upon such removal of an Access Lien, at its sole cost and expense without right of reimbursement from Seller, Buyer may take whatever actions it deems appropriate to pay, compromise, contest, litigate, or otherwise dispose of such third-party claim in a manner that keeps the Property and all portions thereof free of all claims.

(v)      Buyer shall indemnify, protect, defend (with counsel reasonably acceptable to Seller) and hold Seller and its advisors, agents, consultants, employees, independent contractors, officers, representatives (**"Seller Indemnitees"**), successors and assigns harmless from and against all claims, actions, damages, costs, expenses, fines, penalties, fees, charges, and liabilities, including reasonable attorneys' fees (**"Claims"**), arising out of or attributable to any entry onto or inspection or testing of the Property by Buyer and/or its advisors, agents, consultants, employees, independent contractors, legal counsel, officers and/or representatives. Notwithstanding the foregoing, Buyer shall have no obligation to indemnify, defend or hold Seller or the Seller Indemnitees harmless from (i) any adverse conditions or defects on or under the Property not caused by Buyer or the Buyer Parties but which are discovered or exposed by Buyer or the Buyer Parties in the course of exercising its rights under this Agreement, (ii) the results or findings of any tests, including without limitation, any diminution in the value in the Property arising from or relating to matters discovered by Buyer or the Buyer Parties during its investigation of the Property or (iii) any Claims to the extent arising solely and exclusively out of or resulting from Seller or Seller Indemnitee's negligent acts or omissions.

Notwithstanding anything to the contrary state or implied elsewhere herein, Seller acknowledges that, following the Closing, Buyer intends to sell the Property to D.R. Horton CA3, Inc., a Delaware corporation, or its affiliate (collectively, "**Horton**"), and that in connection with such sale, Horton desires access to the Property to conduct investigations of the Property and access to the Due Diligence Items and the results of Buyer's studies and inspections of the Property. Seller hereby agrees that, solely for purposes of this Section 3.4, Horton and Horton's employees, agents, consultants, contractors, attorneys and representatives (collectively, the "**Horton Parties**") shall be deemed to constitute the representatives of Buyer and, accordingly, may enter upon and inspect the physical condition of the Property, subject to the terms and conditions of the Agreement, including but not limited to Buyer's obligations to indemnify and hold Seller harmless from and against any and all Claims arising out of or attributable to any entry onto or inspection or testing of the Property. Seller further agrees that, solely for purposes of Section 9.11, Horton and the Horton Parties shall be deemed to constitute Buyer Parties and that Buyer may disclose to Horton and the Horton Parties (in electronic format or otherwise) the contents of the Agreement, the Due Diligence Items, and all other information, studies and reports relating to the Property obtained by Buyer (collectively, the "**Diligence Materials**"), subject to the terms and conditions of Section 9.11.

**3.5     "AS IS" SALE.**

(a)      AS IS"/"WITH ALL FAULTS"/"WHERE IS". The sale and conveyance by Seller to Buyer, and the purchase and taking by Buyer from Seller of the Property is upon an "AS IS"/"WITH ALL FAULTS"/"WHERE IS" basis and upon all other terms, covenants and conditions set forth in this Agreement. Except for and subject to Seller's express warranties and representations made in **Section 5.2**, the implied warranties made in each Grant Deed (as defined

in **Section 1.1**) as specified in California Civil Code Section 1113, and elsewhere in this Agreement, Buyer:

(i)    Acknowledges and agrees that purchase and taking of each applicable portion of the Property from Seller upon each Closing is upon an "AS IS"/"WITH ALL FAULTS"/"WHERE IS" basis;

(ii)    Has not relied and will not rely on, and Seller has not made and is not liable for or bound by, any other express or implied warranties, guarantees, statements, representations or information pertaining to each applicable portion of the Property being purchased and taken from Seller upon each Closing (specifically including, without limitation, the Due Diligence Items [as defined in **Section 3.2(a)**]) made or furnished by Seller, agent or third party representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing;

(iii)    Represents that Buyer is a knowledgeable, experienced and sophisticated purchaser and developer of real estate and that it is relying solely on its own expertise and that of its advisors, agents, consultants, employees, independent contractors, legal counsel, officers and representatives in purchasing and taking all or any portion of the Property, and shall make an independent verification of the accuracy of any documents, information and materials provided by Seller, including without limitation, the applicable portion of the Submission Items;

(iv)    Will conduct such inspections and investigations of the Property as Buyer deems necessary under **Section 3.4**, including, without limitation, the physical, developmental, entitlement and environmental conditions thereof, and, subject to Seller's express warranties and representations made in **Section 5.2**, the implied warranties made in each Grant Deed as specified in California Civil Code Section 1113 and elsewhere in this Agreement, shall rely only upon same;

(v)    Upon Closing but subject to Seller's express warranties and representations made in **Section 5.2**, the implied warranties made in the each Grant Deed as specified in California Civil Code Section 1113 or elsewhere in this Agreement, or as otherwise provided in this Agreement, shall assume the risk that adverse matters, including, without limitation, adverse physical or construction defects or adverse environmental, health or safety conditions, may not have been revealed by Buyer's inspections and investigations; and

(vi)    Represents and warrants to Seller that Buyer shall have had, by the Closing Date, adequate opportunity to consult with its advisors, agents, consultants, independent contractors, legal counsel and representatives in connection with the transaction contemplated by this Agreement.

**AGAIN EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES MADE IN SECTION 5.2, THE IMPLIED WARRANTIES MADE IN THE DEED AS SPECIFIED IN CALIFORNIA CIVIL CODE SECTION 1113 OR ELSEWHERE IN THIS AGREEMENT, BUYER REPRESENTS THAT: (i) IT IS PURCHASING AND**

TAKING THE PROPERTY IN AN "AS IS"/"WITH ALL FAULTS"/"WHERE IS" CONDITION; AND (ii) IT WAIVES, AND DOES HEREBY DISCLAIM, ALL WARRANTIES OF ANY TYPE OF KIND WHATSOEVER WITH RESPECT TO THE PROPERTY, WHETHER EXPRESS OR IMPLIED, INCLUDING, BY WAY OF DESCRIPTION BUT NOT LIMITATION, THOSE OF FITNESS FOR A PARTICULAR PURPOSE AND USE, TENANTABILITY OR HABITABILITY.   BUYER'S COVENANTS, REPRESENTATIONS, STATEMENTS AND WARRANTIES IN THIS SECTION 3.5 SHALL SURVIVE EACH CLOSING AND THE RECORDATION OF EACH GRANT DEED, SHALL NOT BE MERGED THEREIN FOR THE BENEFIT OF THE PARTIES AND THEIR RESPECTIVE LEGAL REPRESENTATIVES, SUCCESSORS, AND ASSIGNS.

## ARTICLE IV

## CLOSING AND ESCROW

### 4.1    DEPOSIT WITH ESCROW HOLDER AND ESCROW INSTRUCTIONS.

(a)    Upon execution of this Agreement and the receipt of the Deposit by Escrow Holder, this Agreement shall serve as the instructions to Escrow Holder for consummation of the purchase and sale contemplated hereby. In the event Escrow Holder fails to timely so execute and deliver such counterparts, either Buyer or Seller may substitute as Escrow Holder hereunder any other title or escrow company reasonably acceptable to the other which is willing to so execute and deliver this Agreement. Seller and Buyer agree to execute such additional and supplementary escrow instructions as may be appropriate and reasonably necessary to enable the Escrow Holder to comply with the terms of this Agreement; provided, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, including such General Provisions, the terms of this Agreement shall control.

(b)    At least three (3) business days prior to the applicable Closing, the Parties shall provide to Escrow Holder as much information as is then available to enable Escrow Holder to prepare a pre-audit settlement statement setting forth in detail all prorations and adjustments contemplated by this Agreement, including, without limitation, the prorations and adjustments referenced in **Section 4.7**, based on the information available to Escrow Holder. Escrow Holder shall provide such pre-audit settlement statement to the Parties and their respective legal counsel no later than two (2) business days prior to the applicable Closing and shall include therewith an indication of any specific information remaining to be provided to Escrow Holder by the Parties to enable Escrow Holder to show all final prorations and adjustments calculated by the Parties, and required by this Agreement.

(c)    The Parties hereby appoint Escrow Holder, and Escrow Holder agrees to act, as "the person responsible for closing" the transaction contemplated under this Agreement pursuant to Internal Revenue Code Section 6045(e). Escrow Holder shall prepare and file all informational returns, including, without limitation, IRS Form 1099-S and shall otherwise comply with the provisions of Internal Revenue Code Section 6045(e). Escrow Holder shall indemnify, hold harmless and defend each party and its agents, assigns, employees, independent contractors,

representatives and successors from and against any and all actions, causes of action, charges, claims, costs, damages, demands, expenses (including, without limitation, any and all reasonable attorney and expert witness fees and disbursements), fees, liabilities, losses and/or suits asserted against, or incurred or suffered as a result of the failure of Escrow Holder to comply with the provisions of this **Section 4.1(c)**. If any regulations proposed or promulgated by the Internal Revenue Service or the California Franchise Tax Board subject the transactions contemplated hereunder to backup withholding (which would require Buyer to withhold a portion of the Purchase Price from Seller), then Seller will provide Buyer with the necessary declaration in order to exempt such transactions from backup withholding.

**4.2    CLOSING.**

(a)    The closing shall occur, unless sooner terminated in accordance with the provisions hereof, upon the first to occur of: (i) the mutually-agreed date of recordation of the Grant Deed(s) in the Office of the County Recorder of Kern County or (ii) the date which is thirty (30) calendar days from and after the expiration of the Due Diligence Period (the "**Closing Date**"). Buyer acknowledges and agrees that, except as otherwise expressly set forth in this Agreement; it shall have no right or option whatsoever to extend the Closing Date for any reason without the prior written consent of Seller in its sole and absolute discretion. Buyer further acknowledges and agrees that after the Closing Date, it shall have no further right or option to purchase the Property and this Agreement shall be of no further force or effect in that regard.

(b)    The execution and exchange of documents and the delivery of all items required to consummate the transaction contemplated herein under the terms of this Agreement shall be made through Escrow Holder; provided, however, that all such actions shall only be effective, unless expressly indicated otherwise, when the Grant Deed(s) shall be recorded and Escrow Holder shall deliver and disburse all documents and funds deposited with Escrow Holder in accordance with the terms of this Agreement (the occurrence of all such matters is referred to herein as the "**Closing**").

**4.3    CONDITIONS PRECEDENT.**

(a)    Seller shall have no obligation to sell the Property to Buyer and Buyer shall have no obligation to purchase the Property from Seller unless and until the other party shall have complied with each and every condition of this Agreement applicable to it for the applicable Closing, including without limitation, the delivery into Escrow by Seller and Buyer, as applicable, of each of the items set forth in Sections 4.4 and 4.5.

(b)    In addition to any other condition contained in this Agreement, Buyer's obligation to close hereunder is subject to and conditioned upon Escrow Holder's issuance of the Title Policy for the Property, or the unconditional commitment to issue such Title Policy, as of the Closing Date.

**4.4    DELIVERY BY SELLER.** At the Closing, Seller shall deposit with Escrow Holder the following:

(a)    A Grant Deed, duly executed and acknowledged in recordable form.

(b)    Two (2) duly executed counterparts of the Assignment of Intangibles.

(c)     A duly executed Non-Foreign Affidavit in the form of **Exhibit D** attached hereto.

(e)     Closing costs as specified in Section 4.7.

(d)     All other documents and instruments called for hereunder which have not previously been delivered.

4.5     **DELIVERY BY BUYER**. At the Closing, Buyer shall deposit with Escrow Holder the following:

(a)     Two (2) duly executed counterparts of the Assignment of Intangibles.

(b)     Completed and executed "Preliminary Change of Ownership Report" in accordance with California Revenue and Taxation Code Section 480.3.

(c)     Purchase Price less Deposit.

(d)     Closing costs as specified in Section 4.7.

(e)     All other documents and instruments called for hereunder which have not previously been delivered.

4.6     **OTHER INSTRUMENTS**. Seller and Buyer shall each deposit with Escrow Holder such other instruments as are reasonably requested by Escrow Holder or otherwise required for each Closing in accordance with the terms hereof and to obtain the issuance of the Title Policy.

4.7     **REIMBURSABLE COSTS; PRORATIONS AND APPORTIONMENTS**.

(a)     Current installments of real property taxes, special taxes, assessments of all types (including without limitation assessments under improvement and/or maintenance districts and/or similar bonded indebtedness) relating to the Property, and all other encumbrances, debts and/or obligations which run with the land, shall (to the extent approved or deemed approved by Buyer during the Title Review Period) be assumed by Buyer and prorated between Seller and Buyer as of the Closing Date.

(b)     All costs and expenses of owning the Property which have accrued as of the close of business immediately preceding the Closing Date shall be paid by Seller on or before such Closing Date or promptly upon receipt of bills. All costs and expenses of owning the Property which are accrued on or after the Closing Date shall be paid by Buyer.

(c)     All prorations and adjustments shall be made as of the Closing Date based on 30-day month or on a three hundred sixty (360) day year, as applicable, and Buyer shall be deemed the owner of the Property on the Closing Date for proration purposes unless otherwise mutually agreed to by the parties. Except as provided below, any proration which must be estimated at the Closing shall be re-prorated and finally adjusted as soon as practicable but, in any event, no later than sixty (60) days after the Closing Date with any refunds payable to Seller or Buyer to be made as soon as practicable; otherwise, all prorations shall be final.

(d)     A pre-Closing statement setting forth such agreed prorations shall be prepared by Escrow Holder and executed by Seller and Buyer at the Closing. (See, Section 4.11.) Escrow Holder shall not make any proration except as set forth on such executed statement.

(e)    Seller shall pay that portion of the cost of the Title Policy equal to the cost of a California Land Title Association standard policy of title insurance to be issued by Escrow Holder for an amount equal to the Purchase Price, showing title vested in Buyer, subject to all title exceptions approved or deemed approved by Buyer in accordance with **Sections 3.1 above**. Any balance above such portion shall be paid by Buyer, including all endorsements requested by Buyer. Buyer may request the issuance of an American Land Title Association standard or extended coverage policy, provided that (i) such election shall not delay the Closing Date, and (ii) Buyer shall pay any and all excess premiums, survey costs (if any) and other associated fees, costs or expenses over and above the cost of the CLTA standard policy referenced in the preceding sentence.

(f)    Seller shall pay the cost of any documentary or other transfer taxes for the Grant Deed.

(g)    Buyer shall pay all recording and document preparation charges of Escrow Holder.

(h)    Any other expenses or closing costs in connection with this transaction shall be apportioned in the manner customary in Kern County, California. Each party shall pay their respective attorneys' fees.

**4.8    PAYMENT OF PRORATION ADJUSTMENTS**. Either party owing the other party any sum based on adjustments made to prorations after the Closing Date shall promptly pay the same to the other party within ten (10) business days after delivery of a statement therefor. If such payment is not timely made, such sum shall accrue interest at the rate of ten percent (10%) per annum from the date of demand until the date of payment.

**4.9    CLOSE OF ESCROW**. Provided that Escrow Holder has received the documents and funds described in Sections 2.2, 4.4, 4.5, 4.6 and 4.7 above and has not received notice from any party either that an agreement of another party hereunder has not been performed, that a condition set forth herein has not been satisfied or waived or that this Agreement has terminated (by its terms or by an election duly made hereunder), and further provided that the issuance of, or an unconditional commitment to issue, a Title Policy has been obtained, Escrow Holder is authorized and instructed at 8:00 a.m. on the Closing Date to:

(a)    Record the Grant Deed with the Kern County Recorder.

(b)    Assemble, insert the Closing Date in the initial line and deliver one (1) fully executed counterpart of the Assignment of Intangibles to each of Buyer and Seller for the Property.

(c)    Deliver to Buyer the Title Policy and all other items deposited by Seller in this escrow with respect to the Property.

(d)    Deliver to Seller all other items deposited by Buyer in this escrow with respect to the Property.

**4.10    DISBURSEMENT OF FUNDS**. On the Closing Date, Escrow Holder shall disburse the Purchase Price for the Property, as adjusted to reflect Seller's share of prorations and

costs of escrow hereunder, in immediately available funds by wire transfer pursuant to separate instructions to Escrow Holder solely from Seller.

**4.11    NOTIFICATION; CLOSING STATEMENTS**. If Escrow Holder cannot comply with the instructions herein or to be provided, Escrow Holder is not authorized to cause the recording of the foregoing documents, but instead shall notify Seller through Charles Melton, Esq. of Zimmer & Melton, LLP at (661) 463-6700 (cmelton@zimmermelton.com, and Buyer through Christopher Finberg, Esq. of Jones & Beardsley, P.C. at (661) 664-2900 (chris@jonesbeardley.com) of such fact without delay. As soon as reasonably practicable after each Closing Date, Escrow Holder shall deliver to each party a true, correct and complete copy of its respective Closing Statement(s), in form customarily prepared by Escrow Holder, and all other items in Escrow Holder's possession to which such party is entitled hereunder.

**4.12    POST CLOSING COVENANTS**.

(a)    Buyer and Seller mutually covenant that within thirty (30) days from and after the Closing, **and in any event prior to Buyer undertaking any construction activities on or about the Property**, Seller and Buyer shall cooperate so that Buyer shall be substituted as the named owner of the Property and the applicant under any pending permits.

(b)    For good and valuable consideration in the amount of One Dollar and No Cents ($1.00), Buyer hereby covenants that Seller shall have the non-exclusive right and temporary license (the **"Post-Closing License"**) for ninety (90) days following the Closing Date (the **"License Period"**) to enter upon the Property for the limited purposes of winding down Seller's exiting sod operations and clearing the Property of Seller's sod and other personal property. Included in the Post-Closing License and for the duration of the License Period, Seller shall have the right to use the residential house upon that portion of the Property identified as Kern Parcel No. 543-010-08 to house Seller's agent, Dale Edwards, while winding down Seller's sod operations. Seller shall at all times during the License Period procure and maintain at Seller's cost and expense liability insurance covering the Property and Seller's use thereof with policy limits of not less than Five Hundred Thousand Dollars and No Cents ($500,000.00) per occurrence. Furthermore, Seller shall indemnify, protect, defend and hold Buyer harmless from and against any and all claims, liability, loss, cost, damage or expense (including actual attorneys' fees) which Buyer may sustain or incur by reason of or in connection with Seller's use of the Post Closing License granted herein. The Post-Closing License and this Section 4.12 shall survive the Closing and recordation of the Grant Deed.

## ARTICLE V

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**5.1    BUYER'S REPRESENTATIONS**.

(a)    In order to induce Seller to enter into this Agreement and the transactions contemplated hereunder, Buyer hereby represents and warrants, both as of the date hereof and again as of the Closing Date, as follows:

(i)     That this Agreement and all documents executed by Buyer which are to be delivered to Seller hereunder will be duly authorized, executed and delivered by Buyer, are and as of each Closing Date will be legal, valid and binding obligations of Buyer and do not and as of such Closing Date will not violate any provisions of any agreement or judicial order to which Buyer is a party or to which it is subject.

(ii)    Buyer (i) is not a person, group, entity or nation described in Section 1 of Executive Order 13224 - Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism - 66 Fed. Reg. 49079 (dated September 23, 2001, effective September 24, 2001), (ii) is not a (and is not acting, directly or indirectly, for or on behalf of any) person, group, entity or nation designated by any Executive Order or the United States Treasury Department as a terrorist, a "Specially Designated National" or "Blocked Person," or other banned or blocked person, group, entity or nation pursuant to any applicable laws that are administered or enforced by the Office of Foreign Assets Control, (iii) is not initiating, facilitating or engaging in the transaction contemplated by this Agreement, directly or indirectly, for or on behalf of any such person, group, entity or nation, and (iv), to Buyer's knowledge, does not engage in any dealings or transactions, and is not otherwise associated, with any such person, group, entity or nation.

(iii)   Buyer is a limited liability company duly organized, existing, and in good standing under and by virtue of the Applicable Laws of the State of California.

(iv)    Buyer has the full right, power, and authority to purchase the Property from Seller as provided in this Agreement and to carry out its obligations hereunder; and all required action necessary to authorize Buyer to enter into this Agreement and to carry out its obligations hereunder has been or will have been taken prior to the Closing Date.

(v)     There are no attachments, executions, or assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy or under any other debtor-relief laws pending or threatened against Buyer.

(vi)    Buyer represents and warrants that it is a knowledgeable, experienced, and sophisticated buyer and developer of real estate, and that it is relying solely on its own expertise and that of Buyer's consultants in purchasing the Property. Buyer acknowledges and agrees that it will have the opportunity to conduct such inspections, investigations and other independent examinations of the Property and related matters, including, without limitation, the physical and environmental conditions thereof, prior to the Closing and will rely upon same and, except as expressly provided in this Agreement and the documents executed by Seller at the Closing, will not rely upon any statements of Seller or of any agent, attorneys, consultants, employee, director, manager, member, officer, representative and/or stockholders of Seller; and,

(b)     The representations and warranties set forth in this Section 5.1 shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time, and all such representations and warranties shall survive the Closing Date for a period of one (1) year. If, prior to the Closing, Buyer receives actual knowledge of any fact or circumstance that would materially change a representation or warranty of Buyer in this

Agreement, then Buyer shall promptly give written notice of such changed fact or circumstance to Seller.

(c)     If Buyer breaches any of the representations or warranties in Section 5.1, Buyer shall indemnify, protect, defend (with counsel reasonably acceptable to Seller), and hold Seller, its successors and assigns, harmless for, from and against all claims, fines, penalties, fees, charges, and liabilities, including all foreseeable and unforeseeable consequential damages, any other damages, costs and losses, including reasonable attorneys' fees, arising out of or attributable to such breach. Buyer's representations, covenants and warranties set forth in this Agreement shall survive Closing, shall not merge into the Grant Deed to be delivered at Closing and are deemed to be material to Seller's execution of this Agreement and Seller's performance of its obligations hereunder.

## 5.2     SELLER'S REPRESENTATIONS.

(a)     In order to induce Buyer to enter into this Agreement and the transactions contemplated hereunder, Seller hereby represents and warrants, both as of the date hereof and again as of the Closing Date, as follows:

(i)     Seller has the capacity and authority to enter into this Agreement and to consummate the transactions herein provided.

(ii)     Seller is not a party to, or subject to, any agreements, documents, instruments or court orders, which would be violated by Seller's entering into this Agreement and performing its obligations hereunder.

(iii)     Except as set forth in the Due Diligence Items, including without limitation, the PTR, to the best of Seller's knowledge, Seller has not received written notice from any governmental authorities of any violations of any applicable zoning regulation or ordinance or other law affecting or relating to the Property.

(iv)     To the best of Seller's knowledge, the Due Diligence Items are the true, correct and complete copies of such documents.

(v)     To the best of Seller's knowledge, Seller has received no written notice of any actions, suits, claims or other proceedings, governmental or otherwise, pending or contemplated against Seller by reason of its interests in the Property, or which involve or may involve any portion of the Property.

(vi)     To the best of Seller's knowledge and subject to Section 4.12(b), Seller is not a party to any leases or occupancy agreements, either written or oral, granting a right to occupy all or any portion of the Property to any individual or entity.

(vii)     Except as disclosed in the Due Diligence Items to the best of Seller's knowledge, there has been no use, storage, treatment, generation, disposal or release of Hazardous Substance (as defined below) on, under, or from the Property in violation of Applicable Laws, Seller has received no written notice from any governmental agency of any purported violation any such of applicable law or of the existence of any unpermitted above or underground storage tanks located on or under the Property. "Hazardous Substance" means all hazardous or toxic substances, wastes or materials, any pollutants or contaminates (including, without limitation, asbestos and raw materials which include hazardous constituents, radon and urea formaldehyde),

and any other similar substances or materials which are included or regulated by any Applicable Law pertaining to environmental regulation, contamination, clean-up or disclosure, including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, as amended (collectively, "Environmental Laws").

(viii)     There are no service contracts, either written or oral, which shall survive the Closing Date.

(ix)   Seller is not the subject of a bankruptcy or insolvency proceeding.

(x)   Seller (i) is not a person, group, entity or nation described in Section 1 of Executive Order 13224 - Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism - 66 Fed. Reg. 49079 (dated September 23, 2001, effective September 24, 2001), (ii) is not a (and is not acting, directly or indirectly, for or on behalf of any) person, group, entity or nation designated by any Executive Order or the United States Treasury Department as a terrorist, a "Specially Designated National" or "Blocked Person," or other banned or blocked person, group, entity or nation pursuant to any applicable laws that are administered or enforced by the Office of Foreign Assets Control, (iii) is not initiating, facilitating or engaging in the transaction contemplated by this Agreement, directly or indirectly, for or on behalf of any such person, group, entity or nation, and (iv), to Seller's knowledge, does not engage in any dealings or transactions, and is not otherwise associated, with any such person, group, entity or nation.

(b)     As used in this Agreement, the term "to the best of Seller's knowledge" or any similar phrase shall mean the actual present knowledge of Darin Nelson, who is Seller's person most knowledgeable about the Property, without the obligation to review any files or conduct any due-diligence and without the imputation to Darin Nelson of any matter included in any files or known to other parties, including without limitation, the members, employees, agents and contractors of Seller and shall not include any facts that are known or that become known to Buyer or Buyer's agents, employees, contractors, attorneys or representatives. In no event shall Ms. Nelson have any personal liability under this Agreement.

(c)     The representations and warranties set forth in this Section 5.2 shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time, and all such representations and warranties shall survive the Closing Date for a period of one (1) year. If, prior to the Closing, Seller receives actual knowledge of any fact or circumstance that would materially change a representation or warranty of Seller in this Agreement, then Seller shall promptly give written notice of such changed fact or circumstance to Buyer.

## ARTICLE VI

## CASUALTY OR CONDEMNATION

**6.1     DAMAGE OR DESTRUCTION**.  Any Improvements located on the Property are irrelevant to this transaction. Consequently, in the event the Improvements sustain damage caused by fire or other insured casualty after the date hereof and prior to the Closing Date this Agreement shall not terminate as a result thereof, and the Closing Date shall occur as scheduled notwithstanding such damage, and Seller shall be entitled to collect and retain all proceeds of insurance payable by reason of such casualty, except that Seller shall pay over to Buyer, but only from such insurance proceeds, if any, the amount reasonably necessary to demolish and remove any damaged Improvements.

**6.2     CONDEMNATION**. If prior to the Closing Date a material portion of the Property is taken by eminent domain or condemnation proceedings are commenced against the Property, then Buyer shall have the option to terminate this Agreement by written notice to the other and Escrow Holder within five (5) business days after Buyer receives notice of such commencement. For purposes of this Section 6.2, a taking or condemnation shall be deemed to be material if the remaining portion of the Property shall no longer support the construction of at least 606 single family detached residential units. If Buyer fails to terminate this Agreement in the time and manner herein provided, then this Agreement shall continue, and Buyer shall be entitled to any award paid or to be paid in such condemnation proceedings.

**6.3     NO DUTY TO RESTORE**.  Buyer acknowledges and agrees that in no event shall Seller have any obligation to repair or restore the Property or any portion thereof or any other liability hereunder as a result of any casualty or condemnation.

## ARTICLE VII

## DEFAULT AND TERMINATION

**7.1     DEFAULT BY SELLER**.

(a)     If Seller fails to perform any of its obligations or is otherwise in default hereunder, Buyer shall have the right to give notice to Seller and Escrow Holder specifically setting forth the nature of such failure and stating that Seller shall have a period of ten (10) days to cure such failure. If Seller has not cured such failure within such period (or, if such failure is not capable of being cured within ten (10) days, Seller either has not commenced in good faith the curing of such failure within such period or does not diligently thereafter complete such cure prior to the Closing Date), Buyer shall have the right to exercise the following remedies:

(i)     Proceed to the Closing.

(ii)     Extend the time for performance by such period of time as may be mutually agreed upon in writing by the Parties.

(iii)   Terminate this Agreement by notice to Seller and Escrow Holder to that effect, in which event Escrow Holder shall immediately disburse the Deposit (including all additions thereto and interest earned on the investment thereof) to Buyer.

(iv)   File an action in any court of competent jurisdiction to enforce specific performance within six months (6 mos.) of the claimed material default by Seller.

7.2   **DEFAULT BY BUYER**. If Buyer fails to perform any of its obligations or is otherwise in default hereunder, Seller shall have the right to give notice to Buyer and Escrow Holder specifically setting forth the nature of such failure and stating that Buyer shall have either (i) a period of three (3) business day to cure any failure to pay money, or (ii) a period of ten (10) days to cure any other failure. If Buyer has not cured such failure within the applicable period (or, if any such failure under (ii) above is not capable of being cured within ten (10) days, Buyer either has not commenced in good faith the curing of such failure within such period or does not diligently thereafter complete such cure prior to the Closing Date), Seller shall have the right to exercise any of the following mutually exclusive remedies:

(a)   Waive such failure and proceed to the Closing.

(b)   Terminate this Agreement in accordance with the provisions of Section 2.3 above and Section 7.3 below by notice to Buyer and Escrow Holder to that effect.

7.3   **EFFECT OF TERMINATION**.

(a)   Upon the termination of this Agreement for any reason, neither Buyer nor Seller shall have any further obligation hereunder, except pursuant to Section 2.3 above, this Article VII and those provisions which survive such termination pursuant to Section 9.4 below, and Escrow Holder shall, within five (5) business days thereafter, return to the party entitled thereto (or, if not specified hereunder to the contrary, to the party who deposited the same) all items previously deposited with Escrow Holder in connection with this escrow.

(b)   If this Agreement is terminated pursuant to Section 7.1(b) or 7.2(b) above, the party in default shall immediately upon demand from Escrow Holder pay all escrow costs and cancellation charges. In the event this Agreement is terminated for any other reason (and other than as a result of the Closing), Buyer and Seller shall each pay one half (1/2) of all such escrow costs and cancellation charges, and Escrow Holder may withhold Buyer's one half (1/2) from the Deposit prior to disbursing the same.

(c)   If Buyer or Seller timely elects, or is deemed to have elected, to terminate this Agreement in accordance with Section 3.1(d) or 6.2 hereof, Buyer and Seller shall execute supplemental escrow instructions prepared by Escrow Holder canceling the escrow opened hereunder, unconditionally releasing each other from all past and future obligations and liabilities under this Agreement, except to the extent the same survive such termination under Section 9.4 below, and instructing Escrow Holder to immediately disburse the Deposit (less Buyer's one half (1/2) of all escrow costs and cancellation charges) to Buyer.

7.4   **POST-CLOSING REMEDIES.** From and after each Closing and except as may be waived by Buyer prior to a Closing under **Section 5.1**, each Party shall have the right to pursue

its actual damages against the other Party (a) for a breach of any covenant or agreement contained herein that is performable after or that survives such Closing and the recordation of the applicable Grant Deed (including the indemnification obligations of the Parties contained this Agreement, but excluding any obligation to purchase the property); and (b) for a breach of any representation or warranty made by the other Party in this Agreement.  If any Closing does not occur, then (i) each Party shall have its respective rights and remedies as set forth in this Agreement, as applicable; and (ii) each Party shall have all available remedies against the other party for a breach of the other party's obligations contained in this Agreement that are expressly provided herein as surviving the termination of this Agreement.

**7.5** **LIMITATION ON DAMAGES.** TO THE MAXIMUM EXTENT PERMITTED UNDER THE APPLICABLE LAWS OF THE STATE OF CALIFORNIA, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY AS SET FORTH IN THIS AGREEMENT EXCEPT FOR **SECTIONS 7.1, 7.2 AND 9.7**, THE PARTIES AGREE TO WAIVE THE RIGHT TO SEEK AND TO BE ENTITLED TO RECOVER FROM THE OTHER PARTY, ITS EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, SERVANTS, ATTORNEYS, AFFILIATES, PARENT, SUBSIDIARIES, SUCCESSORS AND ASSIGNS CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, PUNITIVE, SPECIAL AND/OR SPECULATIVE DAMAGES.

Seller's Initials: _dn_     Buyer's Initials: _R. Welly_

**7.6** **GENERAL DISCLAIMER; RELEASE; LIMITATION OF DAMAGES.**

(a)     General Disclaimer. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND EXCEPT FOR: (a) SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.2; (b) IMPLIED WARRANTIES MADE IN THE DEED AS SPECIFIED IN CALIFORNIA CIVIL CODE SECTION 1113; AND/OR, (c) ELSEWHERE IN THIS AGREEMENT, BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES THAT NEITHER SELLER NOR ITS PARENT, SUBSIDIARY OR AFFILIATED ORGANIZATIONS, ADMINISTRATORS, AGENTS, ATTORNEYS, BENEFICIARIES, CONSERVATORS, CUSTODIANS, DIRECTORS, EMPLOYEES, EXECUTORS, GUARDIANS, HEIRS, INDEPENDENT CONTRACTORS, JOINT VENTURERS, MEMBERS, OFFICERS, PARTNERS, PREDECESSORS, REPRESENTATIVES, SERVANTS, STOCKHOLDERS, SUCCESSORS, TRUSTEES AND ALL OTHERS ACTING FOR, UNDER, OR IN CONCERT WITH IT, INCLUDING ASSOCIATIONS, CORPORATIONS, LIMITED LIABILITY COMPANIES, AND GENERAL OR LIMITED PARTNERSHIPS, AS APPLICABLE (COLLECTIVELY "SELLER GROUP"), HAS MADE AND IS NOT NOW MAKING, AND BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON (DIRECTLY OR INDIRECTLY), ANY GUARANTIES, REPRESENTATIONS OR WARRANTIES OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, PAST, PRESENT OR FUTURE, WITH RESPECT TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, GUARANTIES, REPRESENTATIONS AND/OR WARRANTIES AS TO: (i) MATTERS OF TITLE; (ii) ENVIRONMENTAL MATTERS RELATING TO THE PROPERTY OR ANY PORTION THEREOF; (iii) GEOLOGICAL CONDITIONS, INCLUDING, WITHOUT LIMITATION, SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND WATER RESERVOIRS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER AND EARTHQUAKE FAULTS AND THE RESULTING DAMAGE OF PAST AND/OR FUTURE EARTHQUAKES; (iv) WHETHER, AND TO THE EXTENT TO WHICH, THE PROPERTY OR ANY PORTION THEREOF IS AFFECTED

BY ANY STREAM (SURFACE OR UNDERGROUND), BODY OF WATER, FLOOD PRONE AREA, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARD; (v) DRAINAGE; (vi) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, PAST SOIL REPAIRS, SOIL ADDITIONS OR CONDITIONS OF SOIL FILL, OR SUSCEPTIBILITY TO LANDSLIDES, OR THE SUFFICIENCY OF ANY UNDERSHORING; (vii) ZONING TO WHICH THE PROPERTY OR ANY PORTION THEREOF MAY BE SUBJECT; (viii) THE AVAILABILITY OF ANY UTILITIES TO THE PROPERTY OR ANY PORTION THEREOF INCLUDING, WITHOUT LIMITATION, ELECTRICITY, GAS, SEWAGE AND WATER; (ix) USAGES OF ADJOINING PROPERTY, (x) ACCESS TO THE PROPERTY OR ANY PORTION THEREOF; (xi) THE VALUE, COMPLIANCE WITH THE DESIGNS, DRAWINGS, PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTIONS, SUITABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE PROPERTY OR ANY PORTION THEREOF; (xii) ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE PROPERTY OR ANY PART THEREOF; (xiii) THE PRESENCE OF HAZARDOUS SUBSTANCES IN OR ON, UNDER OR IN THE VICINITY OF THE PROPERTY; (xiv) THE CONDITION OR USE OF THE PROPERTY OR COMPLIANCE OF THE PROPERTY WITH ANY OR ALL PAST, PRESENT OR FUTURE APPLICABLE LAWS, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS; (xv) THE EXISTENCE OR NON-EXISTENCE OF UNDERGROUND STORAGE TANKS; (xvi) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE PROPERTY; (xvii) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE PROPERTY; (xviii) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE PROPERTY; (xix) THE MERCHANTABILITY OF THE PROPERTY OR FITNESS OF THE PROPERTY FOR ANY PARTICULAR PURPOSE (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON THE SKILL OR JUDGMENT OF SELLER OR ANY MEMBER OF SELLER GROUP TO SELECT OR FURNISH THE PROPERTY FOR ANY PARTICULAR PURPOSE, INCLUDING AGRICULTURE, AND THAT SELLER MAKES NO WARRANTY THAT THE PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE); OR, (xx) TAX CONSEQUENCES (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, USE OR PROVISIONS RELATING TO ANY TAX CREDITS). BUYER ACKNOWLEDGES, UNDERSTANDS AND AGREES ALSO THAT, EXCEPT FOR: (a) SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.2; (b) IMPLIED WARRANTIES MADE IN THE DEED AS SPECIFIED IN CALIFORNIA CIVIL CODE SECTION 1113, AND/OR, (c) ELSEWHERE IN THIS AGREEMENT, ANY DOCUMENTATION AND/OR INFORMATION OF ANY TYPE WHICH BUYER HAS RECEIVED OR MAY RECEIVE FROM SELLER OR ANY MEMBER OF SELLER GROUP, INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL ASSESSMENTS, AUDITS, STUDIES AND SURVEYS, IS FURNISHED ON THE EXPRESS CONDITION THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN, BUYER SHALL NOT RELY THEREON, BUT SHALL MAKE AN INDEPENDENT VERIFICATION OF THE ACCURACY OF SUCH INFORMATION, ALL SUCH INFORMATION BEING FURNISHED, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER.

Buyer's Initials

    **(b)**   Release. Buyer shall rely solely upon its due diligence upon and inspection of the Property in determining the Property's physical condition and upon the following: (a) Seller's express representations and warranties set forth in Section 5.2; (b) the implied warranties made in the Deed as specified in California Civil Code Section 1113, or, (c) elsewhere in this Agreement. Except for the foregoing, Buyer waives, as of the Closing, Buyer's right to recover from Seller or any member of Seller Group, any and all damages, losses, liabilities, costs or expenses whatsoever, and claims therefor, whether

direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to: (i) the physical condition or state of repair of the Property; and, (ii) the Property's compliance, or lack of compliance with any Applicable Laws, including, without limitation, Environmental Laws. Buyer expressly waives the benefits of California Civil Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

In this connection and to the extent permitted by Applicable Law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Buyer further agrees represents and warrants that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends, subject to: (x) Seller's express representations and warranties set forth in Section 5.2; (y) the implied warranties made in the Deed as specified in California Civil Code Section 1113, and/or, (z) elsewhere in this Agreement, to release, discharge and acquit Seller and each and every member of Seller Group, from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which might in any way be included as a material portion of the consideration given to Seller by Buyer in exchange for Seller's performance hereunder. Seller has given Buyer material concessions regarding this transaction in exchange for Buyer agreeing to the provisions of this Section 7.6(b). Each party has initialed this Section 7.6(b) to further indicate their awareness and acceptance of each and every provision of this Section 7.6(b).

Seller's Initials: _____    Buyer's Initials: _____

## ARTICLE VIII

## MAINTENANCE OF THE PROPERTY

**8.1    MAINTENANCE.** Unless this Agreement is earlier terminated in accordance with its terms, from and after the date hereof through the Closing Date, Seller shall maintain the Property in its present condition, reasonable wear and tear excepted.

## ARTICLE IX

## MISCELLANEOUS

**9.1    NOTICES.** Any notice, approval or other communication required or permitted to be given under this Agreement shall be in writing signed by the party giving such notice, and shall be deemed to have been given: (a) upon delivery by a recognized private courier company, (b) one (1) day after being deposited with Federal Express or another reliable overnight courier service, (c) upon receipt if transmitted by e-mail, provided that an additional notice is sent pursuant to

clause (a), (b) or (d) herein, or (d) three (3) days after being deposited in the United States mail, registered or certified mail, postage prepaid, return receipt required, and addressed as follows:

| | |
|---|---|
| **If to Seller:** | Ms. Darin Nelson<br>PO Box 9173<br>Bakersfield, CA 93389<br>Email:dnelson@oldriversod.com |
| with a copy to: | Zimmer & Melton, LLP<br>11601 Bolthouse Drive, Suite 100<br>Bakersfield, CA  93311<br>Attn: Charles D. Melton, Esq., Partner<br>Telephone: 661-463-6700<br>E-Mail: cmelton@zimmermelton.com |
| **If to Buyer:** | Deertrail Development, LLC<br>Attn:  Russ Johnson<br>28749 Banducci Rd.<br>Tehachapi, CA 93561<br>E-Mail: russ.johnson@mac.com |
| with a copy to: | Jones & Beardsley, P.C.<br>Attn:  Chris Finberg<br>9201 Camino Media, Suite 120<br>Bakersfield, CA  93311<br>E-Mail: chris@jonesbeardsley.com |
| **If to Escrow Holder:** | First American Title Insurance Company<br>_____, Escrow Officer<br>3400 Douglas Blvd, Suite 100<br>Roseville, CA 95661 |

or such other address as either party may from time to time specify in writing to the other in accordance with this Section 9.1.

### 9.2    BROKERS AND FINDERS.

(a)      Seller hereby represents and warrants that it has agreed to pay no broker's fee, finder's fee, commission or other similar compensation in connection herewith and it has not acted through any broker or finder, except Doug Carter, Real Estate Broker's License No. 01098135, of Watson Realty ("**Broker**"), who shall be compensated entirely by Seller as set forth in separate agreement, who could claim any such other or additional compensation. Seller further agrees to indemnify and hold Buyer harmless from and against all damages, liabilities, costs, expenses and losses (including, without limitation, reasonable attorneys' fees and costs) which Buyer may sustain or incur by reason of any claim for any such fee or compensation, other than claims based upon dealings solely with Buyer.

(b)      Buyer hereby represents and warrants that it has agreed to pay no broker's fee, finder's fee, commission or other similar compensation in connection herewith, and it has not acted through any broker or finder who could claim any such other or additional compensation. Buyer further agrees to indemnify and hold Seller harmless from and against all damages, liabilities, costs, expenses and losses (including, without limitation, reasonable attorney's fees and costs) which Seller may sustain or incur by reason of any claim for any such fee or compensation, other than claims based upon dealings solely with Seller.

**9.3    SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and assigns; provided, however, that Buyer's interest hereunder may not be assigned, encumbered or otherwise transferred, whether voluntarily, involuntarily, by operation of law or otherwise, without the prior consent of Seller, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, Buyer shall have the right to assign its entire right, title and interest in and to this Agreement (including, without limitation, in and to the Deposit) (a) to any entity in which Buyer has a controlling ownership interest or (b) to a qualified 1031 exchange accommodator or to any entity in which Buyer or an affiliate of Buyer is an owner, and Buyer, or the individuals owning a controlling interest in Buyer, own a controlling interest in, or are the managers of, such assignee; provided such assignee, other a qualified 1031 exchange accommodator, unconditionally assumes and agrees to perform all of Buyer's duties, obligations, liabilities and undertakings under this Agreement and accepts and agrees to all other terms and conditions hereof, including, without limitation, Section 9.8 below (Authority of Individuals).

**9.4    SURVIVAL    OF    REPRESENTATIONS    AND    WARRANTIES.** All representations, covenants and warranties of the parties contained herein or in any document, certificate or statement delivered pursuant hereto are intended to and shall remain true and correct at all times during the term of this Agreement and shall be deemed to be material. Subject to Sections 5.1 (c) and 5.2 (c) above, each such representation and warranty shall survive the Closing Date and any other termination of this Agreement for a period of one year (1 yr.); all indemnities contained herein shall survive the Closing Date and any other termination of this Agreement without such limitation; and Buyer's obligations under Section 9.11 below shall survive any termination of this Agreement other than as a result of the Closing Date without such limitation.

**9.5    FURTHER ACTS.** Each party shall, at the request of the other, execute, acknowledge (if appropriate) and deliver such additional documents, and do such other acts, as may be reasonably required in order to accomplish the intent and purposes of this Agreement.

**9.6    MERGER OF PRIOR AGREEMENTS; AMENDMENTS.** This Agreement and the Schedules and Exhibits hereto constitute the full and complete agreement and understanding, and supersede all prior and contemporaneous agreements and understandings, between the parties hereto relating to the subject matter hereof. Without limiting the foregoing, the parties acknowledge and agree that all prior offers, counter offers and correspondence regarding the Property among the parties or their predecessors or agents are null and void and of no force or effect. This Agreement may be amended or modified only by a written instrument executed by the party asserted to be bound thereby.

**9.7    ATTORNEYS' FEES**. If either Buyer or Seller brings any suit or other proceeding with respect to the subject matter or to enforce any provision of this Agreement, the prevailing party (as determined by the court, agency or other authority which adjudicates such suit or proceeding) shall, in addition to such other relief as may be awarded, be entitled to recover attorneys' fees, expenses and costs of investigation as actually incurred (including, without limitation, attorneys' fees, expenses and costs of investigation incurred in appellate proceedings, in establishing the right to indemnification or in any action or participation in, or in connection with, any state or federal bankruptcy or debtor relief case or proceeding).

**9.8    AUTHORITY OF INDIVIDUALS**. Each individual executing this Agreement on behalf of Buyer and Seller hereby represents and warrants that (a) such individual has full power and authority to execute this Agreement on behalf of its party, and (b) the execution and delivery of this Agreement have been duly authorized by such party and such execution is binding thereon.

**9.9    VALIDITY**. If any condition, covenant, provision or term of this Agreement shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby, but such condition, covenant, provision or term shall be reduced or otherwise modified by such court or authority only to the minimum extent necessary to make it valid and enforceable, and each condition, covenant, provision and term of this Agreement shall be valid and enforceable to the fullest extent permitted by law. If any condition, covenant, provision or term cannot be reduced or modified to make it reasonable and permit its enforcement, it shall be severed from this Agreement and the remaining conditions, covenants, provisions and terms shall be interpreted in such a way as to give maximum validity and enforceability to this Agreement. It is the intention of the Parties hereto that if any condition, covenant, provision or term of this Agreement is capable of two (2) constructions, one of which would render the condition, covenant, provision or term void and the other of which would render the condition, covenant, provision or term valid, then the condition, covenant, provision or term shall have the meaning which renders it valid.

**9.10    NO WAIVER**. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any waiver constitute a continuing waiver. Except as otherwise provided in this Agreement, no waiver shall be binding unless executed by the party making the waiver.

**9.11    CONFIDENTIALITY**. All nonpublic information, studies and reports relating to the Property disclosed by Seller to Buyer shall remain confidential and if the transaction contemplated herein fails to close for any reason, Buyer shall deliver to Seller, at no cost to Seller, all such information, reports and studies and make no further distributions or disclosures thereof. Buyer and Seller agree that, to the extent reasonably practical, they shall keep the nonpublic contents of this Agreement confidential and that no publicity or press release to the general public with respect to this transaction shall be made by either party without the prior written consent of the other; provided, however, Buyer's identity as the Buyer of the Property may be fully disclosed. Without limiting the generality of the foregoing, Buyer further agrees that all nonpublic information contained within the Due Diligence Items and all other nonpublic information, studies

and reports relating to the Property obtained by it (whether by the observations and examinations of Buyer or any of its officers, directors, employees, brokers, agents, accountants, attorneys, lenders or other representatives (including, without limitation, Horton and the Horton Parties [defined in Section 3.4 above]) (collectively, including Buyer, the "**Buyer Parties**") or as disclosed to it by Seller or any other person) shall be held in the confidence and shall not be distributed, disclosed, copied or otherwise reproduced, or the contents thereof otherwise disseminated in any fashion, without the prior written consent of Seller in its sole and absolute discretion; provided, however, that those Buyer Parties whose review of any such item is reasonably necessary to Buyer's determination as to whether or not to proceed with its proposed acquisition of the Property shall be permitted to review or be informed of the content of such item. In addition, Buyer shall use commercially reasonable efforts to ensure Buyer Parties, including, without limitation, Horton and the Horton Parties, keep all information, studies and reports relating to the Property disclosed by Seller confidential. Further, Buyer and the Buyer Parties may, without Seller's prior written consent, disclose the Diligence Materials (defined in Section 3.4 above) in response to a subpoena or as required by any applicable laws or the rules of any stock exchange. Seller further agrees that the delivery of any Diligence Materials to the Buyer Parties (including Horton and the Horton Parties) in electronic format (e.g., via email or PDF) shall in no event be deemed to constitute the distribution, disclosure, copying, reproduction or dissemination of such Diligence Materials in violation this Section 9.11. Notwithstanding anything herein to the contrary, "nonpublic information" does not include information which (a) is or becomes generally available to the public other than as a result of a disclosure by Buyer or any of the Buyer Parties (including, without limitation, Horton and the Horton Parties), (b) was available on a nonconfidential basis prior to its disclosure by Buyer or any of the Buyer Parties (including, without limitation, Horton and the Horton Parties), (c) becomes available to Buyer or the Buyer Parties (including, without limitation, Horton and the Horton Parties) on a nonconfidential basis from a person other than Seller who is not otherwise known to Buyer or any Buyer Parties (including, without limitation, Horton and the Horton Parties) to be bound by a confidentiality agreement with Seller, or (d) information independently developed by Buyer or the Buyer Parties (including, without limitation, Horton and the Horton Parties) without reliance on the information provided by Seller on a confidential basis. This Section 9.11 shall terminate upon the Closing or six (6) months after the termination of this Agreement.

    **9.12**   **POSSESSION**.  Subject to Section 4.12(b), Possession of the applicable Property shall be delivered to Buyer on the Closing Date.

    **9.13**   **INTERPRETATION**.  Words in the singular shall be deemed to include the plural and vice-versa and words in a particular gender shall be deemed to include each other gender. The captions and headings of the Articles and Sections of this Agreement are for convenience of reference only and shall not be deemed to define or limit the provisions hereof. Time shall be of the essence of every provision of this Agreement.

    **9.14**   **GOVERNING LAW; VENUE**.  This Agreement together with all attachments and exhibits shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the State of California (without reference to choice of law principles). The Parties hereby irrevocably submit to the process, jurisdiction, and venue of the Kern County

Superior Court for purposes of suit, action or other proceedings arising out of or relating to this Agreement. Without limiting the generality of the foregoing, the Parties hereby waive and agree not to assert by way of motion, defense or otherwise in any such suit, action or proceeding any claim that any such Party is not personally subject to the jurisdiction of the above-named courts, that suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. If either Party institutes any legal proceedings with respect to this Agreement, the other Party and its directors, managers, members, officers, and stockholders shall appear in Kern County, California, for all such proceedings and all discovery proceedings in connection therewith, including, without limitation, all depositions, and such other Party and its officers, directors and stockholders hereby waive all rights to require that such proceedings or discovery take place outside of Kern County, California.

**9.15   COUNTERPARTS; VALIDITY UPON MUTUAL EXECUTION.** This Agreement may be executed in one or more counterparts by the parties hereto. All counterparts shall be construed together and shall constitute one agreement. Buyer and Seller acknowledges and agrees that this Agreement shall be of no force or effect unless and until a copy hereof is fully executed and delivered by a Manager of Buyer and Seller and, accordingly, execution hereof by either party shall constitute only an offer to purchase or sell, as applicable, which offer shall remain revocable until duly executed and delivered by both parties. This Agreement may be executed by e-mail or facsimile transmission with all such counterparts constituting a single instrument and with any e-mail or facsimile signature having the same force and effect as an "ink original". This Agreement shall be of no force or effect unless and until a copy hereof is executed by Buyer and Seller.

**9.16   TAX-DEFERRED EXCHANGE.** Buyer and Seller each agree to reasonably cooperate with the other's efforts to integrate the transactions contemplated hereunder into a tax-deferred exchange under Section 1031 of the IRC; provided, however, that in no event shall (a) the cooperating party incur any material additional cost, obligation or liability by reason of such exchange (including, without limitation, any responsibility or liability of any kind for the failure of such exchange to be consummated or to qualify for tax-deferred status under any federal or State law or rule and any damage calculated or related in any fashion to the other party's lost tax benefits) or be required to hold title to any property, (b) the Closing be delayed or the Closing Date extended, or (c) shall the party effectuating the exchange be relieved of any of its agreements, warranties, liabilities or other obligations under this Agreement.

**9.17   CONSENT.** As used in this Agreement, "sole and absolute discretion" shall mean sole, absolute, unfettered and unreviewable judgment and discretion without regard to whether such judgment or discretion is exercised reasonably or unreasonably. If no standard is set for the exercise of any approval, consent, discretion or judgment, it shall be presumed to be a reasonableness standard, with consent not being unreasonably conditioned, delayed or withheld.

**9.18   TIME.** Time is of the essence of this Agreement. In the event any deadline or date for performance specified in this Contract falls on a Saturday, Sunday or any holiday for which the Kern County Superior Court is closed, then such deadline or date for performance shall be extended to the business day immediately following such Saturday, Sunday or holiday.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first set forth above.

**SELLER:**     THE ROBERT D. NELSON AND DARIN C. NELSON
REVOCABLE TRUST DATED JULY 28, 1997

By:     _Darin C Nelson_
        DARIN C. NELSON
Its     Trustee

**BUYER:**     DEERTRAIL DEVELOPMENT, LLC,
a California limited liability company

By:     _[signature]_
        Russell G. Johnson, Member

By:     Milano Land & Cattle Company, LLC,
        a California limited liability company,
        its Member

By:     _[signature]_
        Mark R. Milano
        its Managing Member

[signatures continue on the following page]

Nelson and Deertrail Development

## CONSENT OF ESCROW HOLDER

The undersigned Escrow Holder hereby agrees to (a) accept the foregoing Agreement as its Escrow Instructions, (b) be Escrow Holder under said Agreement for its normal and customary fees, and (c) be bound by said Agreement in the performance of its duties as Escrow Holder; provided, however, that the undersigned shall have no obligations, liabilities or responsibilities under this Consent or otherwise as to any amendment to said Agreement unless and until the same shall be accepted by the undersigned; and provided, further, that this Consent is conditioned upon the parties signing such separate supplemental escrow instructions as the undersigned may request in order to incorporate Escrow Holder's General Provisions, all as contemplated under Section 4.1 of this Agreement.

FIRST AMERICAN TITLE INSURANCE COMPANY
3400 Douglas Boulevard, Suite 100
Roseville, CA 95661.

By: _____

Name: _____

Title:   Escrow Officer

## EXHIBIT A

### Legal Description of the Property

**[The legal descriptions for the parcels are subject to change pending the title commitment.]**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BAKERSFIELD, COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1:**

THE N 1/2 OF THE SE 1/4 OF SECTION 32, TOWNSHIP 30 SOUTH, RANGE 27 EAST, M.D.M., IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT AN UNDIVIDED 1 1/2 INTEREST IN AND TO ALL OIL, GAS AND/OR OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN THE DEED FROM J.D. HADLOCK, ET AL, RECORDED FEBRUARY 6, 1943 IN BOOK 1125, PAGE 149, OFFICIAL RECORDS.

Kern County Assessor's Parcel No. APN 543-010-08

**PARCEL 2:**

BEING AN ADJUSTMENT OF THOSE PORTIONS OF LAND SHOWN AS A PORTION OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 32, T. 30 S., R 27 E., M.D.M. EXCEPTING THEREFROM THAT PORTION DEEDED TO THE STATE OF CALIFORNIA PER BOOK 6683, PAGE 2404, O.R. AND THAT PORTION OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 32, T. 30 S., R 27 E., M.D.M PER DEED RECORDED IN BOOK 2735, PAGE 454, O.R, IN THE CITY OF BAKERSFIELD, COUNTY OF KERN, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 32 AND THE CENTERLINE INTER- SECTION OF TAFT HIGHWAY (S.R. 119) AND GOSFORD ROAD, SAID CORNER MARKED BY A CALIFORNIA DIVISION OF HIGHWAY BRASS CAP IN LAMPHOLE MARKED FOR SECTION CORNER; THENCE NORTH 89°11'02" WEST ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER OF SECTION 32 AND THE CENTERLINE OF TAFT HIGHWAY (S.R 119), 1201.08 FEET TO THE TRUE POINT OF BEGINNING;

| | |
|---|---|
| THENCE | THENCE CONTINUING NORTH 89°11'02" WEST ALONG LAST SAID LINE, 1442.41 FEET TO THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SECTION 32; |
| THENCE | NORTH 00°24'12" EAST ALONG THE WEST LINE OF THE SOUTHEAST QUARTER OF SECTION 32, A DISTANCE OF 1321.26 FEET; |
| THENCE | SOUTH 89°12'32" EAST, 2642.28 FEET TO THE EAST LINE OF THE SOUTH-EAST QUARTER OF SECTION 32 AND THE CENTERLINE OF GOSFORD ROAD; |
| THENCE | SOUTH 00°21'05" WEST ALONG LAST SAID LINE, 422.42 FEET; |

THENCE        DEPARTING SAID LINE AT RIGHT ANGLE NORTH 89°38'55" WEST, 500.00
              FEET;

THENCE        SOUTH 00°21'05 WEST PARALLEL WITH THE EAST LINE OF THE
              SOUTHEAST QUARTER OF SECTION 32 AND THE CENTERLINE OF
              GOSFORD ROAD, 851.78 FEET TO THE NORTH LINE OF THE PARCEL OF
              LAND DEEDED TO THE STATE OF CALIFORNIA PER BOOK 6683, PAGE
              2404, O.R

THENCE        ALONG THE BOUNDARY OF SAID PARCEL OF LAND DEEDED TO THE
              STATE OF CALIFORNIA THE FOLLOWING TWO COURSES;

              NORTH 89°13'00" WEST, 700.73 FEET;

              SOUTH 00°47'00" WEST, 43.76 FEET TO THE TRUE POINT
              OF BEGINNING

CONTAINS:   69.18 ACRES

Kern County Assessor's Parcel No. APN: 543-010-10 and 543-010-12

## EXHIBIT B

### Form of Grant Deed

RECORDING REQUESTED BY:

_____

_____

AND WHEN RECORDED MAIL TO:

_____

_____

MAIL TAX STATEMENTS TO:

_____

(Space above this line is for recorder's use)

Assessor's Parcel No. _____

**DARIN C. NELSON**, Trustee of **THE ROBERT D. NELSON AND DARIN C. NELSON REVOCABLE TRUST DATED JULY 28, 1997** ("Grantor"), as the grantor, declares:

| | |
|---|---|
| DOCUMENTARY TRANSFER     COUNTY $ | CITY $ |
| TAX Counties: | TAX |
| Monument Preservation     N/A | |

☒ computed on full value of Property conveyed, or
☐ computed on full value less value of liens or encumbrances remaining
☐ Unincorporated     ☒ City of Bakersfield

### GRANT DEED

FOR GOOD AND VALUABLE CONSIDERATION, the adequacy and receipt of which is hereby acknowledged, Grantor, hereby GRANTS to DEERTRAIL DEVELOPMENT, LLC, a California limited liability company ("Grantee"), as the grantee, all of Grantor's respective interests in that certain real property in the County of Kern, State of California, consisting of approximately One Hundred Forty-Six and Sixty-One Hundredths assessed acres (146.61 assessed acs.), identified as Kern County Assessor's Parcel No(s). 543-010-08, 543-010-10, and 543-010-12 and legally described in Exhibit A attached hereto and incorporated herein by reference as if fully set forth at length (collectively, the "Property").

NOTWITHSTANDING THE FOREGOING, THIS GRANT DEED IS MADE, AND THE PROPERTY IS CONVEYED, BY GRANTOR TO GRANTEE SUBJECT TO THE FOLLOWING:

1.      Taxes and assessments which are a lien, but which are not yet billed, or are billed but are not yet due and payable;

2.      All covenants, conditions, easements, restrictions, liens, encumbrances and other matters of record or which are discoverable by inspection or an accurate survey; and

3.      All laws, regulations or ordinances (including, but not limited to, zoning, building and environmental laws, regulations and ordinances) applicable to the Property.

IN WITNESS WHEREOF, the undersigned Grantor has executed this Grant Deed as of _____, 2021

GRANTOR:

**THE ROBERT D. NELSON AND DARIN C. NELSON REVOCABLE TRUST DATED JULY 28, 1997**

By:      _____

DARIN C. NELSON

Its      Trustee

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA            }
                              }ss.
COUNTY OF _____      }


On _____, 2021, before me, _____,
a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Signature


(seal)

**EXHIBIT A**
TO GRANT DEED

**LEGAL DESCRIPTION OF PROPERTY**

**[The legal descriptions for the parcels are subject to change pending the title commitment.]**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BAKERSFIELD, COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1:**

THE N 1/2 OF THE SE 1/4 OF SECTION 32, TOWNSHIP 30 SOUTH, RANGE 27 EAST, M.D.M., IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT AN UNDIVIDED 1 1/2 INTEREST IN AND TO ALL OIL, GAS AND/OR OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS EXCEPTED IN THE DEED FROM J.D, HADLOCK, ET AL, RECORDED FEBRUARY 6, 1943 IN BOOK 1125, PAGE 149, OFFICIAL RECORDS.

Kern County Assessor's Parcel No. APN 543-010-08

**PARCEL 2:**

BEING AN ADJUSTMENT OF THOSE PORTIONS OF LAND SHOWN AS A PORTION OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 32, T. 30 S., R 27 E., M.D.M. EXCEPTING THEREFROM THAT PORTION DEEDED TO THE STATE OF CALIFORNIA PER BOOK 6683, PAGE 2404, O.R. AND THAT PORTION OF THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 32, T. 30 S., R 27 E., M.D.M PER DEED RECORDED IN BOOK 2735, PAGE 454, O.R, IN THE CITY OF BAKERSFIELD, COUNTY OF KERN, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 32 AND THE CENTERLINE INTER- SECTION OF TAFT HIGHWAY (S.R. 119) AND GOSFORD ROAD, SAID CORNER MARKED BY A CALIFORNIA DIVISION OF HIGHWAY BRASS CAP IN LAMPHOLE MARKED FOR SECTION CORNER; THENCE NORTH 89°11'02" WEST ALONG THE SOUTH LINE OF THE SOUTHEAST QUARTER OF SECTION 32 AND THE CENTERLINE OF TAFT HIGHWAY (S.R 119), 1201.08 FEET TO THE TRUE POINT OF BEGINNING;

| | |
|---|---|
| THENCE | THENCE CONTINUING NORTH 89°11'02" WEST ALONG LAST SAID LINE, 1442.41 FEET TO THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF SECTION 32; |
| THENCE | NORTH 00°24'12" EAST ALONG THE WEST LINE OF THE SOUTHEAST QUARTER OF SECTION 32, A DISTANCE OF 1321.26 FEET; |
| THENCE | SOUTH 89°12'32" EAST, 2642.28 FEET TO THE EAST LINE OF THE SOUTH-EAST QUARTER OF SECTION 32 AND THE CENTERLINE OF GOSFORD ROAD; |
| THENCE | SOUTH 00°21'05" WEST ALONG LAST SAID LINE, 422.42 FEET; |

THENCE       DEPARTING SAID LINE AT RIGHT ANGLE NORTH 89°38'55" WEST, 500.00 FEET;

THENCE       SOUTH 00°21'05 WEST PARALLEL WITH THE EAST LINE OF THE SOUTHEAST QUARTER OF SECTION 32 AND THE CENTERLINE OF GOSFORD ROAD, 851.78 FEET TO THE NORTH LINE OF THE PARCEL OF LAND DEEDED TO THE STATE OF CALIFORNIA PER BOOK 6683, PAGE 2404, O.R

THENCE       ALONG THE BOUNDARY OF SAID PARCEL OF LAND DEEDED TO THE STATE OF CALIFORNIA THE FOLLOWING TWO COURSES;

                 NORTH 89°13'00" WEST, 700.73 FEET;

                 SOUTH 00°47'00" WEST, 43.76 FEET TO THE TRUE POINT OF BEGINNING

CONTAINS:   69.18 ACRES

Kern County Assessor's Parcel No. APN: 543-010-10 and 543-010-12

## EXHIBIT C

## FORM OF ASSIGNMENT OF INTANGIBLES AND BILL OF SALE

**THIS ASSIGNMENT OF INTANGIBLES AND BILL OF SALE** ("Assignment") is dated and effective as of the _____ (_____) day of _____, 202__ (the "Effective Date"), by and between **DARIN C. NELSON**, Trustee of **THE ROBERT D. NELSON AND DARIN C. NELSON REVOCABLE TRUST DATED JULY 28, 1997** ("Seller"), and **DEERTRAIL DEVELOPMENT LLC**, a California limited liability company ("Assignee"), at Bakersfield, California, who agree and contract as described below. Seller and Assignee are referred to singularly as "party" on a generic basis and collectively as the "parties."

## R E C I T A L S

This Agreement is made with reference to the following facts and circumstances:

A.      As of the date hereof, Assignee has acquired that certain real property in or about the City of Bakersfield, Kern County, California, more particularly described on Exhibit A attached hereto. Such land, together with the improvements and other items transferred by Seller to Assignee as of the date hereof are being purchased by Assignee pursuant to that certain *Purchase and Sale Agreement and Escrow Instructions* dated as of _____, 2021 (the "Purchase Agreement"), and are hereinafter referred to collectively as the "Property."

B.      Seller desires to induce Assignee to consummate the purchase of the Property by assigning to Assignee, on the terms and conditions set forth herein, its interest, *if any, and only to the fullest extent assignable,* in all entitlements, tentative and final maps, development rights, and privileges appurtenant to said Property, used, owned, or held solely in connection with the development of the Property including, without limitation: (i) any tentative map and/or final map and all entitlements, subdivision agreements, and other agreements relating solely to the development of the Property; (ii) all plans, specifications, maps, drawings, and other renderings relating solely to the development of the Property; (iii) all warranties and development rights solely benefiting the Property; (iv) all rights, claims, or awards solely benefiting the Property; and (vi) all rights to receive a reimbursement, credit, or refund from the applicable agency or entity of any deposits or fees paid in connection with the development of the Property except as provided otherwise in the Agreement (collectively, the "Intangible Property").

**NOW, THEREFORE, IN RELIANCE** upon the foregoing Recitals and in consideration of the mutual covenants set forth herein and in the Purchase Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Intangible Property**.   Seller hereby sells, assigns, transfers and delivers to Assignee, and to Assignee's successors and assigns, all of its right, title and interest in and to the Intangible Property.

2.      **Obligations**. By this Assignment, Seller also delegates to Assignee all of Seller's duties, obligations, and responsibilities of performance, if any, under the Intangible Property, and Assignee hereby accepts same from Seller, and also agrees to perform such duties, obligations and responsibilities from and after the Effective Date.  If applicable, then Assignee shall be responsible for all transfer taxes, including without limitation, sales, use, excise, stamp, documentary, filing, recording, permit, license, authorization, or other similar taxes and filing fees and similar charges on the Rights that may become due, owing, and payable upon the Effective Date under the laws of the State of California.

3.      **As Is**. The Intangible Property sold, assigned and delivered hereunder is conveyed by Seller and accepted by Assignee AS IS"/"WITH ALL FAULTS"/"WHERE IS" basis to Assignee, which Assignee acknowledges and understands. THUS, SELLER MAKES THIS SALE OF THE RIGHTS AND THIS ASSIGNMENT TO ASSIGNEE WITHOUT ANY EXPRESS OR IMPLIED   WARRANTIES,   AND   SPECIFICALLY   DISCLAIMS   THE   IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE, AND THE PARTIES AGREE THAT THE RIGHTS ARE BEING SOLD UPON AN "AS IS"/"WITH ALL FAULTS"/"WHERE IS" BASIS.

4.      **Integration** This Assignment, the Purchase Agreement and the other documents described therein contain the entire agreement between the parties and constitute an integration of the entire agreement, contract, promise and understandings of the parties.  All prior agreements, conditions, contracts, promises, representations, understandings, or warranties, whether oral of written, express or implied, concerning the subject matter of this Assignment are expressly superseded hereby and have no further force or effect, except for the Purchase Agreement and the other documents described in this Assignment and the Purchase Agreement.  This Assignment may not be altered, amended, or modified in any respect, except by a writing duly executed by all the parties.

5.      **Additional Acts.**   Each party shall execute and deliver any and all additional papers, documents or other assurances and shall perform any further acts which may be reasonably necessary to carry out the intent of the parties and this Assignment.

6.      **Successors; No Third-Party Beneficiary.** This Assignment shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, heirs and legatees of the respective parties. This Assignment is made for the sole benefit of the parties and their respective successors and assigns, and no other person or persons shall have any right of action hereon.

7.      **Attorneys' Fees**. In the event of the bringing of any action or suit by a Party against another party hereunder by reason of any breach of any of the covenants, conditions, agreements or provisions on the part of the other party arising out of this Assignment, then in that event the prevailing party shall be entitled to have and recover of and from the other party all costs and expenses of the action or suit, including reasonable attorneys' fees.

8.    **Governing Law; Venue.** This Assignment shall be construed, enforced, governed by, interpreted and performed pursuant to the internal laws, and not the law of conflicts, of the State of California applicable to agreements, contracts and understandings made and to be performed in such state. The parties also agree that this Assignment is made and to be performed in Kern County, California, and therefore that the only proper venue for any litigation shall be the Kern County Superior Court.

9.    **Headings.** Headings are used herein for convenience only and shall have no force or effect in the construction or interpretation of this Assignment. As used in this Assignment, the singular includes the plural and masculine includes the feminine and neuter. This Assignment shall not be construed against the party drafting it but shall be construed fairly and equitably as though it was the joint product of the parties.

10.    **Counterparts.** This Assignment may be executed in one or more counterparts by the parties hereto, in which event all counterparts shall be construed together and shall constitute one agreement once they have been assembled and delivered by Escrow Holder as of the Closing Date under the Purchase Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Assignment as of the date first set forth above.

SELLER:

**THE ROBERT D. NELSON AND DARIN C. NELSON REVOCABLE TRUST DATED JULY 28, 1997**

By: _____
     DARIN C. NELSON
Its   Trustee

ASSIGNEE:

**DEERTRAIL DEVELOPMENT, LLC,** a California limited liability company

By: _____
     Russell G. Johnson, Member

By:   Milano Land & Cattle Company, LLC,
     a California limited liability company,
     its Member

     By: _____
          Mark R.  Milano
          its Managing Member

**EXHIBIT D**

**NON-FOREIGN AFFIDAVIT**
**(SECTION 1445 CERTIFICATE)**

Section 1445 of the Internal Revenue Code provides that a transferee of an interest in real property located within the United States must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon a disposition of an interest in real property located within the **DARIN C. NELSON**, Trustee of **THE ROBERT D. NELSON AND DARIN C. NELSON REVOCABLE TRUST DATED JULY 28, 1997** ("Transferor"), the undersigned hereby certifies the following:

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor's U.S. Employer Identification Numbers are _____;

3       Transferor is (is not) a disregarded entity as defined in Code §1.1445–2(b)(2)(iii) and;

4.      Transferor's office address is _____.

The undersigned acknowledges that this Certificate may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could result in punishment by fine, imprisonment or both. Under penalty of perjury the undersigned declares that it has examined this Certificate and to the best of its knowledge and belief it is true, correct and complete.

DATED: _____, 2021

**SELLER:**

> **THE ROBERT D. NELSON AND DARIN C. NELSON REVOCABLE TRUST DATED JULY 28, 1997**
>
> By:   _____
>         DARIN C. NELSON
> Its    Trustee